[No. B073479. Second Dist., Div. Three. Oct. 31, 1995.]

CHARLES J. LYONS, JR., Plaintiff and Appellant, v.
SECURITY PACIFIC NATIONAL BANK et al., Defendants and
Respondents.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions deleted are noted by the insertion of the following symbol at points of omission [[/]].

**COUNSEL**

Hillel Chodos and Michael A. Chodos for Plaintiff and Appellant.

Pillsbury, Madison, & Sutro, Charles E. Patterson, Walter R. Allan, Klein, Wegis, DeNatale, Goldner & Muir, Ralph B. Wegis, Kirk S. Tracey and David L. Saine for Defendants and Respondents.

## OPINION

ALDRICH, J.—In this appeal, we review the judgments entered in favor of two defendant entities, Security Pacific National Bank (the Bank), and Michael Yurosek, David Yurosek and Mike Yurosek & Son (the Yuroseks), in an action brought by plaintiff Charles J. Lyons, Jr., a cosignatory with the Yuroseks on a $2,350,000 promissory note to the Bank. The complaint alleged three counts of conspiracy among defendants. According to the alleged conspiracy, the Bank agreed with the Yuroseks to seek repayment of the entire $2,350,000 from Lyons only. Meanwhile, the complaint alleged, the Yuroseks amassed a $23 million sham debt to the Bank, and then granted the Bank security interests in all of their remaining assets. Lyons alleged this preferential transfer was made for the purpose of preventing him from obtaining contribution from the Yuroseks for their share of the funds Lyons paid to the Bank in satisfaction of the $2,350,000 loan.

The Bank successfully moved for summary judgment on the ground its actions in protecting its security interest in the Yuroseks' collateral, based on the underlying $23 million debt, were lawful with the result no conspiracy existed. The trial court then sustained the Yuroseks' demurrer to the second cause of action for conspiracy to interfere with prospective economic advantage. Once the Bank was dismissed from the action by virtue of the summary judgment, only one defendant, the Yuroseks, remained against whom Lyons could proceed on his two-count conspiracy complaint. Lyons stipulated to a nonsuit for the purpose of filing the instant appeal to challenge the summary judgment, demurrer and various procedural rulings.

[[/]]*

There was no error in granting the summary judgment. Lyons opposed the motion without providing evidentiary support for his position. We hold a party may not orally oppose a motion for summary judgment. The purpose of such motion is to establish whether a material issue exists which must be decided by a trier of fact. Once the moving party makes out a prima facie case, the burden shifts to the opponent to show there is no material issue of fact. Without at least a separate statement and evidence in the form of supporting affidavits or declarations, it is impossible to demonstrate the

*See footnote, *ante,* page 1001.

disputed facts. Although Lyons had the opportunity to ask for a continuance under subdivision (b) of section 437c of the Code of Civil Procedure, he failed to do so. Moreover, Lyons had already fully litigated the legitimacy of the Yuroseks' underlying $23 million debt and validity of the Bank's liens in two previous actions which had reached finality and so res judicata precludes retrial of those issues. As a result, in opposing the summary judgment motion, Lyons was unable to dispute that the Bank's liens on the Yuroseks' property, to secure the underlying $23 million debt, were valid and superior to Lyons's judgment lien. As a matter of law, the Bank did not participate in any conspiracy; in receiving transfers from the Yuroseks, the Bank took fully legitimate action toward a lawful goal, namely to protect and enforce its preexisting security interests. Furthermore, because the undisputed facts show Lyons collected full contribution from the Yuroseks plus accrued interest, he has suffered no damage from the alleged common scheme.

[[/]]* Accordingly, we shall affirm the judgment.

FACTUAL AND PROCEDURAL SYNOPSIS

The following history has been gleaned from Lyons's second amended complaint and from the copious documentation filed in support of the Bank's motion for summary judgment, including the declarations of Robert Morrison, Esq. and Robert Gutkin, Esq., both attorneys representing the Bank, George K. Rosenstock, Esq., former attorney for the Bank, the Bank's request for judicial notice, and all exhibits attached to the request and declarations.

1. *The Debts*

At issue in this appeal are two separate loan transactions involving the Bank: the first is a loan made to the Yuroseks and Lyons; and the second is represented by a series of loans made to the business entities owned by the Yuroseks. The debtors defaulted on all of these loans. *Despite the fact the Yuroseks have fully repaid Lyons all that they owed him, plus accrued interest,* the Bank's efforts to collect on the two debts have resulted in the underlying litigation. The transactions are described in more detail below.

a. *The $2,350,000 Renewal Note.* Lyons entered into a partnership entitled RYLY Farms with Michael and David Yurosek and one Carl Ross, (not a party to this action) in late 1977, for the purpose of farming land in California's Central Valley. In December 1988, the Yuroseks informed the remaining partners that defendant Security Pacific had agreed to extend a $3 million line of credit. However, the Bank would only agree to advance the

---

*See footnote, *ante*, page 1001.

money to the partners, not to the partnership. Accordingly, Lyons and the Yuroseks each signed the note *individually*. The complaint alleges, "The obligations of Lyons and the Yuroseks under said note were expressly declared and agreed to be *joint and several*." (Italics added.) Unable to repay the note, on December 1, 1989, Lyons and the Yuroseks signed a renewal note (the Renewal Note) in the amount of $2,350,000 to be repaid by April 1990. The Renewal Note was not repaid when it came due.

b. *The Yurosek Debt.* Meanwhile, almost two months *before* the above transaction was initiated, on October 23, 1988, the Yuroseks, Mike Yurosek & Sons and Cal-World Produce, Inc., executed a revolving note (the Revolving Note) for a $5.5 million working capital loan. The Revolving Note was amended on March 1, 1989, with respect to interest. On October 31, 1988, the same parties executed a credit agreement under which the Yuroseks agreed, among other things, to repay all of their obligations to the Bank, including debts represented by certain standby letters of credit and the Revolving Note. The credit agreement was also amended several times.

By February 1990, the Yuroseks were in default under their Revolving Note and credit agreement. The Bank also discovered between January 1989 and February 1990, that the Yuroseks had incurred a $16,750,000 overdraft. Between the two obligations, the Yuroseks' outstanding debt to the Bank approached $23 million.

2. *The Bank's efforts to collect both debts.*

On April 30, 1990, the Bank and the Yuroseks entered into a workout agreement (the Workout Agreement) designed to restructure the $23 million debt. The Bank had concluded, rather than take possession of the farms and sell the assets which would render the Bank a return of 20 cents to 30 cents on the dollar, or force the Yuroseks into bankruptcy, the most financially beneficial approach to the $23 million debt would be to enable Yurosek, Inc., to stay in business. Accordingly, pursuant to the Workout Agreement, the Yuroseks executed a promissory note in favor of the Bank for $16,750,000. Additionally, David and Michael Yurosek signed personal guarantees to the Bank. As security for the guarantees, the Yuroseks executed security agreements granting the Bank liens on certain of their personal property, including partnership property, deposit accounts, instruments, stocks, equipment and certain other fixtures and improvements on their real property. Excluded from the ambit of the Bank's liens were personal residences worth several million dollars, certain personalty, and $1 million in cash held by Michael Yurosek. The Workout Agreement specified that the obligations would mature on December 31, 1990.

On May 18, 1990, the Bank initiated arbitration proceedings against Lyons and the Yuroseks to collect the $2,350,000 owed under the Renewal Note.

On December 28, 1990, the Bank extended to June 28, 1991, the Yuroseks' obligations under the Workout Agreement. As additional security for the extension, the Yuroseks assigned their interest in two promissory notes. The Bank began efforts to locate a buyer for Yurosek, Inc.

On May 26, 1991, in the arbitration proceeding to collect the $2.35 million owed by Lyons and the Yuroseks on the Renewal Note, the arbitrator issued his final award in favor of the Bank and against the Yuroseks and Lyons jointly and severally for a total in excess of $2.8 million.

On June 6, 1991, the Yuroseks requested the Bank further extend the Workout Agreement until December 31, 1991. The investment firm retained to assist in locating a buyer for Yurosek, Inc., indicated it would not be able to market the farm until serious health code violations had been corrected, and expansion of Yurosek, Inc.'s facilities to meet the demand for its baby carrots, had been completed. Extension of the Workout Agreement was requested to enable the Yuroseks to conduct this work. Toward this end, the parties negotiated an extension agreement (the Extension Agreement) which did not provide for the pledge of additional collateral.

During negotiations, the Yuroseks asked that the Bank refrain from enforcing the arbitration award against them on the $2,350,000 Renewal Note until December 31, 1991. The Bank refused, but indicated a willingness to discuss further the possibility of settling the arbitration award. The Extension Agreement reiterated this willingness: "The Letter Agreement is hereby amended to add a new Paragraph 2.32 which states as follows: '*Agreement to Discuss.* The Bank will discuss with Yurosek & Son *and RYLY* possible approaches to a settlement which would include a discussion of, among other things, a potential settlement of the debt of RYLY to Yurosek & Son and Cal-World. This Paragraph 2.32 should not be construed as a commitment by the Bank to agree to any settlement other than a settlement which in the Bank's sole and absolute discretion is acceptable to the Bank.'" (Italics added.)

Negotiations on the Extension Agreement continued until June 30, 1991, when the Bank learned for the first time that the Yuroseks had an inventory shortage of approximately $500,000 to $700,000 and could not satisfy representations in the Extension Agreement. Viewing this as a serious breach of obligation, the Bank insisted, in return for any additional extensions, the

Yuroseks would be required to pledge additional personal assets as collateral. Finally, the Bank agreed to extend the maturity date of the Yuroseks' obligations to July 19, 1991, in return for which *David* Yurosek executed a security agreement granting the Bank a security interest in all of his personal property. This extension was executed on July 2, 1991.

On July 3, 1991, the arbitration award on the $2,350,000 Renewal Note was confirmed and judgment was entered thereon by the trial court. At the confirmation hearing, Lyons sought an order for contribution from the Yuroseks. The court ruled any such order was premature given judgment had neither been entered nor paid. On July 8, 1991, Lyons satisfied the entire arbitration award by paying the Bank.

In an effort to resolve the Yuroseks' inventory shortage, on July 17, 1991, *Michael* Yurosek executed a pledge and security agreement granting the Bank a lien on all of his personalty so as to allow the extension of the maturity date beyond July 1991.

3. *Lyons's efforts to obtain contribution.*

Two days later, on July 19, 1991, Lyons obtained an order of contribution from the superior court representing two-thirds of the funds he had paid to the Bank in satisfaction of the arbitration award. Such order was filed on July 24, 1991. In September 1991, Lyons executed on that judgment, seizing personalty, including wine, doll and porcelain collections, belonging to the Yuroseks and located in both Los Angeles and Kern Counties.

Perceiving its security interests to be superior, based on the $23 million the Yuroseks owed for the Revolving Note obligation and the $16,750,000 overdraft, the Bank filed a third party claim to the property seized by the sheriffs. Lyons objected to the Bank's claim and a hearing was held. Judge Sohigian ruled on February 13, 1992, that the Bank held valid, perfected liens, superior to Lyons's judgment lien. Lyons then moved for a marshalling order, which motion Sohigian denied, stating, "I find that it has not been demonstrated, and indeed, I find it not to be the fact, that either marshalling or inverse order of alienation activity can be accomplished without impairing the rights of the bank or without exposing the bank to substantial risk of loss. . . ."

Lyons filed appeals from both of Sohigian's rulings. However, during the pendency of those appeals, the Yuroseks found a buyer for their business. With the Bank's approval, the Yuroseks sold their business, enabling them to settle with the Bank for $17 million before taxes, a loss of $4.5 million, and

to *fully satisfy Lyons's judgment lien, with interest.* Lyons thereafter released his liens on the property and filed a "Suggestion of Mootness" with the Court of Appeal. As a result, the appeal was dismissed as moot.

### 4. *The Instant Lawsuit*

Dissatisfied with the result, and notwithstanding Lyons had collected full contribution with interest from the Yuroseks, Lyons filed the instant action against the Bank and the Yuroseks alleging, in his second amended complaint, three counts of conspiracy: 1) to breach a fiduciary duty; 2) to interfere with prospective economic advantage; and 3) to commit fraudulent conveyance. At the heart of the conspiracy, Lyons alleged, the Yuroseks "borrowed massive sums from [the Bank] over 1988 and 1989 for their own businesses other than for RYLY Farms, including $16 million in overdraft coverage which accrued as part of a check-kiting scheme engaged in by the Yuroseks . . . with [the Bank's] knowledge and acquiescence. . . . [A]s part of the 'workout agreement' . . . the Yuroseks and the Bank agreed together that the Bank would seek to collect the entire $2.35 million Note, and all sums due thereunder, solely from Lyons and not from the Yuroseks. . . . [and] the Bank agreed to cooperate with the Yuroseks to violate their fiduciary duties to Lyons and to hinder, delay and prevent Lyons from obtaining or enforcing any order of contribution against the Yuroseks for their share of the sums paid by Lyons under the $2.35 million Note. . . ." Lyons also alleged immediately before the hearing on his motion for an order of contribution, ". . . the Bank entered into further agreements with [the Yuroseks] whereby the bank was given purported or ostensible liens on the Yuroseks' personal residences, certificates of deposit and all of the items of valuable personal property which the Bank and the Yuroseks had previously represented were being left in the hands of the Yuroseks for the satisfaction of Lyons' claims . . . ."

The Bank moved for summary judgment on the ground all of the actions it took to protect its security interests were lawful with the result there existed no conspiracy to take illegal action. In support of its motion, the Bank filed the above described declarations and attached exhibits. By arrangement with the trial court, *Lyons opposed the motion orally and presented no declarations or supporting documentation.* The trial court granted summary judgment in favor of the Bank. Immediately thereafter, the court sustained the Yuroseks' demurrer to the second cause of action for conspiracy to interfere with prospective economic advantage contained in the second amended complaint. The court overruled the demurrer to the other two causes of action.

This appeal resulted when, on the day trial was scheduled to begin, Lyons faced only one defendant, the Yuroseks, against whom to proceed on his

complaint for conspiracy. Hence, Lyons stipulated to a nonsuit for the purpose of filing an appeal from the two earlier dispositive rulings.

We summarize additional facts with the appropriate discussion on appeal.

## DISCUSSION

I. *The Yuroseks' Demurrer to the Second Amended Complaint Was Properly Sustained.*

[[/]]*

II. *Summary Judgment in Favor of the Bank Was Proper.*

1. *Preliminary procedural issue.*

[[/]]*

2. *Standard of review.*

 Turning to the validity of the summary judgment, the motion was brought and heard in 1992, before the Legislature significantly amended Code of Civil Procedure section 437c. We therefore review the propriety of the grant of summary judgment pursuant to the provisions in effect at that time. (*Wyzard* v. *Goller* (1994) 23 Cal.App.4th 1183, 1185 [28 Cal.Rptr.2d 608].)

In 1992, Code of Civil Procedure section 437c "and case law construing it, firmly established that summary judgment was to be granted only if the papers showed that there was no triable issue as to any material fact and that the moving party was entitled to judgment as a matter of law. . . ." (*Wyzard* v. *Goller, supra,* 23 Cal.App.4th at p. 1185.) The statute sets forth the well settled rules for resolving motions for summary judgment. On review from the grant of summary judgment, "We apply the same three-step analysis required of the trial court: 'First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond . . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.' [Citation.]" (*Zuckerman* v. *Pacific Savings Bank* (1986) 187 Cal.App.3d

*See footnote, *ante,* page 1001.

1394, 1400-1401 [232 Cal.Rptr. 458].) Because "the determination of the trial court is one of law based upon the papers submitted, the appellate court must make its own independent determination of their construction and effect." (*Id.* at p. 1400.)

■■■ Lyons's second amended complaint alleged three counts of conspiracy. The Bank's motion for summary judgment is premised on the grounds 1) the actions of the Bank and the Yuroseks were lawful with the result that no conspiracy existed, and 2) Lyons was repaid by the Yuroseks for their share of the arbitration award. In opposing the motion and on appeal, Lyons acknowledged the Bank's actions might be lawful, but argued the Bank's underlying motive and intent were not legal. Hence, the issue to be resolved by the trial court on the motion for summary judgment was precisely whether the Bank's lawful action in protecting its security interests, was rendered unlawful because the Bank harbored some fraudulent intent.

3. *No material fact was disputed.*

a. *In opposing the motion for summary judgment, Lyons presented no evidence, supported by either affidavits or declarations, raising a dispute of fact.*

■■■ In resolving a summary judgment motion, the trial court seeks to " ' ". . . discover, through the supporting papers, whether the parties possess evidence requiring the weighing procedures of a trial. [Citation.]" ' [Citation.]" (*Sinai Memorial Chapel* v. *Dudler* (1991) 231 Cal.App.3d 190, 197 [282 Cal.Rptr. 263].)

■■■ Lyons did not contradict any factual predicate offered by the Bank in support of its motion. With the trial court's permission, Lyons's opposition was made *orally, at the hearing on the motion.* Hence, Lyons offered no separate statement, affidavits, declarations or other supporting documentary evidence to dispute or contradict the Bank's factual showing, in contravention of the statute. (Code Civ. Proc., § 437c, subd. (b).)

Lyons's entire oppositional effort consisted of his attorney's argument that "it is a triable issue of fact for the jury in this case whether the transfer was actually a legitimate preference, was a sham or simulated transfer designed to defeat of [*sic*] claims of Lyons. We have alleged that that element or ingredient enters into all three causes [of] action of our complaint. . . ." Lyons insisted "the Bank took simulated—what *we will prove* to be simulated liens on the Yuroseks' personal property." Continuing, Lyons argued, "We allege and *we're prepared to prove* that we believe there

is at least a triable issue for the jury. That the April, 1990[,] transaction and the July[] 1991, transaction were part of an ongoing agreement and conspiracy between the Yuroseks and the Bank for the Yuroseks to use the Bank as a buffer or as a blocking device to keep Lyons from getting to their property." (Italics added.)

None of these so-called facts constitutes more than mere allegation or simple promise to prove facts at a later date. ▉ "An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities [citation]." (*Sinai Memorial Chapel* v. *Dudler*, *supra*, 231 Cal.App.3d at pp. 196-197), or by allegations in the complaint. (*Melorich Builders, Inc.* v. *Superior Court* (1984) 160 Cal.App.3d 931, 934 [207 Cal.Rptr. 47].) ▉ Clearly, the assertions and allegations of Lyons's attorney, unsupported by declarations or affidavits, do not serve to create a factual issue here.

▉ The inevitable result obtains: " 'When no affidavits are filed in opposition to a motion for summary judgment, the court is entitled to accept as true the facts alleged in the movant's affidavits, provided they are within the personal knowledge of the affiant and are facts to which he could competently testify. [Citations.] . . .' [Citation.]" (*Melorich Builders, Inc.* v. *Superior Court*, *supra*, 160 Cal.App.3d at p. 935.)

▉ Nor may Lyons be heard to complain that by allowing him to oppose the motion orally he was prevented from submitting documentary evidence that would conform to the statutory requirements of Code of Civil Procedure section 437c. Permission to present an oral opposition was granted at Lyons's behest because of tactical decisions he made: 35 days before the discovery cutoff date, and 2 months before trial was scheduled to begin, *Lyons* sought permission to amend his complaint to add a cause of action. Because the defendants objected on the ground it left them no time to conduct discovery on the new count, *Lyons* agreed that the Bank's motion for summary judgment could be filed and heard on an expedited basis with less than 28 days' notice. Then, *Lyons* vigorously opposed defendants' attempts to postpone trial. As a result, with two weeks remaining before trial and relying on Lyons's stipulation, the Bank moved for summary judgment. Complaining he had insufficient time in which to respond to the Bank's motion for summary judgment (the very same motion Lyons had suggested could be filed late), and because he was preparing for trial, *Lyons exacted permission to oppose the motion orally*. Having created the time constraints, then failing to ask for a continuance pursuant to subdivision (b) of section

437c of the Code of Civil Procedure, and having chosen not to file evidentiary support for his opposition notwithstanding he was preparing for trial, Lyons cannot be heard to complain about the inevitable result. (Cf. *Horsemen's Benevolent & Protective Assn.* v. *Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1555 [6 Cal.Rptr.2d 698].)

 b. *Res judicata bars retrial of the legitimacy of the Yuroseks' $23 million debt.*

 ■ Even assuming Lyons's opposition satisfies the statutory requirements for opposing the motion for summary judgment, which we hold it does not, the doctrine of res judicata bars Lyons from disputing that the conduct of the defendants in creating the $16 million debt and entering into the Workout Agreement was legal.

 ■ " 'The doctrine of res judicata precludes parties or their privies from relitigating a cause of action that has been finally determined by a court of competent jurisdiction. Any issue necessarily decided in such litigation is conclusively determined as to the parties or their privies if it is involved in a subsequent lawsuit on a different cause of action.' [Citation.]" (*Thibodeau* v. *Crum* (1992) 4 Cal.App.4th 749, 754 [6 Cal.Rptr.2d 27].) " '[T]he rule is that the prior judgment is *res judicata* on matters which were raised or could have been raised, on matters litigated or litigable.' [Citation.]" (*Id.* at p. 755, original italics.)

 "In determining the validity of a plea of res judicata three questions are pertinent: [¶] 1. Were the issues decided in the prior adjudication identical with those presented in the later action? [¶] 2. Was there a final judgment on the merits? [¶] 3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication? [Citations.]" (*Stafford* v. *Yerge* (1954) 129 Cal.App.2d 165, 168 [276 P.2d 649].)

 ■ "The doctrine of res judicata applies not only to judicial proceedings but also to arbitration proceedings," including "all matters within the scope of the arbitration, related to the subject matter, and relevant to the issues. . . ." (*Thibodeau* v. *Crum, supra,* 4 Cal.App.4th at p. 755.)

 ■ In the arbitration brought by the Bank to recover the money owed on the Renewal Note, which note was executed by the signatories individually, Lyons raised the exact same issue he later raised in his conspiracy complaint. The arbitrator explained, "It was the *contention of Lyons* that the Yuroseks and/or the bank, by *their conduct,* either absolved him completely from any liability on the Note or, at worst, *reduced his joint and several*

*liability* to one in which his only liability on the Note would be for his pro rata share of either one-third or one-quarter. [¶] The conduct which Lyons claimed entitled him to the benefit of these assertions consisted, according to him, of two sets of circumstances: *a series of massive overdrafts* entered into by certain of the entities controlled by the Yuroseks resulting in some *16 million dollars* being owed by them to the bank and *a workout agreement between them and the bank* in which, according to Lyons, *the bank took assets from the Yuroseks that Lyons could have used to assert his claim for equitable subrogation after the bank had attached his property* for full satisfaction of the note which is being sought against him in this arbitration proceeding." (Italics added.)

The arbitrator found, "The law requires that Lyons must prove his contentions by either clear and convincing evidence or at least by a preponderance of the evidence. *He has done neither.*" Hence, the arbitrator explicitly rejected Lyons's claim that the so-called $16 million check-kiting scheme and the Workout Agreement were illegally devised for the purpose of forcing Lyons to bear the full burden of repaying the $2,350,000 Renewal Note to the Bank. As the issue was necessarily *fully litigated* and *finally resolved* against Lyons, all three elements of res judicata exist here to bar Lyons from relitigating whether the Yuroseks' $23 million debt was a sham. (*Stafford* v. *Yerge, supra,* 129 Cal.App.2d at p. 168.)

c. *Res judicata bars retrial of the validity and superiority of the Bank's liens.*

■ Lyons's contention to the contrary, Judge Sohigian's ruling, in the context of the hearings on the Bank's third party claim (Code Civ. Proc., § 720.210), and Lyons's marshalling motion (Civ. Code, § 3433), that the Bank's liens were valid and superior to Lyons's judgment lien, is also res judicata.

Lyons argues the doctrine of res judicata does not apply to Judge Sohigian's rulings because in the two proceedings before that court the contentions were "necessarily limited to the specific, technical requirements of" Code of Civil Procedure section 720.210 and Civil Code section 3433, which procedures he contends are completely different from the "requirements of a cause of action for tortious fraudulent conveyance."

However, validity of the Bank's liens was precisely at issue in the hearing on the third party claim. (Code Civ. Proc., § 720.310, subd. (a).) Moreover, a review of the transcript from the three days of hearing on Lyons's marshalling motion reveals *Lyons raised the same fraud issues* in an attempt

to assert his own right to the Yuroseks' personalty: ". . . the basic principle is that the bank is entitled to come first, but they are not entitled to take their first position or to utilize their first position in a way which will inequitably or unfairly defeat or delay the rights of Lyons as a secondary creditor, lienholder." Continuing, Lyons argued, *"here are people who ran a $17 million debt with a check kite and then sold a million dollars out the back door. . . ."* (Italics added.) Lyons further asserted, "you have evidence here . . . about *the way the bank and the Yuroseks have acted to squeeze out Charlie Lyons. . . .* [W]e, the bank came in; we got a lien on their business and we took over control of the business, and while we have been in control of the business, we have been paying out salaries and fees and legal fees to the Yuroseks to fight Charlie [Lyons]." (Italics added.)

As he was permitted to do (*Lannan* v. *Garrett* (1937) 23 Cal.App.2d 367, 369-370 [73 P.2d 620]), Judge Sohigian recognized and considered Lyons's argument that the court should disbelieve the Bank's motives. Judge Sohigian rejected the argument, ruling instead in favor of the Bank.

We conclude Lyons is seeking to retry in the underlying conspiracy action here, the very same issues that were fully litigated and finally decided in the two proceedings before Judge Sohigian. That the underpinning of the hearings before Judge Sohigian was statutory does not alter applicability of the doctrine of res judicata: " 'It is the title, right or obligation sought to be established or enforced, not the remedy or the relief sought, which determines the nature and substance of the cause of action. . . .' [Citation.]" (*Stafford* v. *Yerge, supra,* 129 Cal.App.2d at p. 171.) Lyons objected to the Bank's asserted superior rights to the Yuroseks' personality during both the third party claim and the marshalling proceedings by challenging the validity of the Bank's security interests. That issue was fully litigated and so in opposing the Bank's motion for summary judgment, Lyons is precluded from disputing the validity and superiority of the Bank's liens now.

Nevertheless, citing *Chamberlin* v. *City of Palo Alto* (1986) 186 Cal.App.3d 181 [230 Cal.Rptr. 454], and *Minor* v. *Lapp* (1963) 220 Cal.App.2d 582, 584 [33 Cal.Rptr. 864], Lyons disputes the finality of Judge Sohigian's rulings. Lyons argues the dismissal of his appeals from Judge Sohigian's rulings on the ground of mootness means the underlying judgments are not final. We disagree.

"The dismissal of an appeal shall be with prejudice to the right to file another appeal within the time permitted, unless the dismissal is expressly made without prejudice to another appeal." (Code Civ. Proc., § 913.) The dismissal of Lyon's appeal from the Sohigian judgment *was not made*

*without prejudice*. Hence it is final and binding and principles of res judicata bar Lyons's attempt to relitigate the validity of the liens.

Nor do *Chamberlin* and *Minor* persuade us otherwise. *Minor*, relied on by *Chamberlin*, is factually inapposite. In *Minor*, before dismissing the appeal, the reviewing court noted the appellant's concern that, as the result of the dismissal, the judgment below would become final and res judicata. Although the *Minor* court disagreed that res judicata would apply, still, "to preclude any possible claim of application of res judicata," citing the former section 913, the court dismissed the appeal *"without prejudice"* so the appellant could pursue her appeal later. (*Minor* v. *Lapp*, *supra*, 220 Cal.App.2d at p. 584, italics added.)

The logical conclusion of Lyons's position, that when an appeal is dismissed for mootness, in a context such as here, the underlying judgment is not final, is absurd: it is tantamount to stating the rule that all such underlying judgments from which appeals are taken and later dismissed as moot would *never* become final. Here, Sohigian's judgment was filed on February 13, 1992. The remittitur issued February 24, 1993. It is final. Viewed differently, absent Lyons's appeal, the underlying judgment became final when the period for filing an appeal expired. (Cal. Rules of Court, rule 2(a).) To hold, as Lyons would have us, that the dismissal of his appeal in 1992, does not render Judge Sohigian's ruling final, would be to conclude, three years later, that the judgment is still exposed to attack. This we will not do.

In sum, Lyons's argument to the contrary, there exists no triable issue that the liens were valid and superior and that the $23 million debt and Workout Agreement were not trumped up for the purpose of preventing Lyons from obtaining contribution of less than a million dollars from the Yuroseks. These facts are binding on Lyons in opposing the Bank's motion for summary judgment here.

4. *The Bank is entitled to summary judgment as a matter of law.*

 In a motion for summary judgment, the issues are framed by the pleadings. (*Fireman's Fund Ins. Co.* v. *City of Turlock* (1985) 170 Cal.App.3d 988, 994 [216 Cal.Rptr. 796].) Cast in three causes of action, Lyons's complaint sounds in conspiracy: 1) conspiracy to breach fiduciary duty, 2) conspiracy to interfere with prospective economic advantage and 3) conspiracy to commit fraudulent conveyance.

 Civil conspiracy consists of " '. . . (1) the formation and operation of the conspiracy, (2) the *wrongful act* or acts done pursuant thereto, and (3)

the damage resulting from such act or acts.' [Citation.]" (*H & M Associates* v. *City of El Centro* (1980) 109 Cal.App.3d 399, 413 [167 Cal.Rptr. 392], italics added.)

" 'To constitute a conspiracy the purpose to be effected by it must be unlawful in its nature or in the means to be employed for its accomplishment, and, where the object in view is lawful and not unlawful means are used, there can be no civil action for conspiracy, even though damage results and even though defendants acted with malicious motives.' " (*Riner* v. *Paskan* (1963) 213 Cal.App.2d 499, 504 [28 Cal.Rptr. 846].) It is the " '. . . acts done and not the conspiracy to do them which should be regarded as the essence of the civil action.' [Citation.]" (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 511 [28 Cal.Rptr.2d 475, 869 P.2d 454].) No cause of action for conspiracy can exist unless "the pleaded facts show something was done which, without the conspiracy, would give rise to a right of action [citations]." (*Agnew* v. *Parks* (1959) 172 Cal.App.2d 756, 762 [343 P.2d 118]; see also *Applied Equipment Corp., supra,* at p. 511.)

The Bank's position, in arguing for summary judgment, was that its actions in perfecting and enforcing its liens against the Yuroseks were lawful, and so there was no conspiracy to do an unlawful act. Further, because Lyons obtained full contribution from the Yuroseks with interest, he suffered no damages.[1]

Turning to the transfers of collateral to the Bank to secure the Yuroseks' obligations, for over 400 years, the rule has been that an insolvent or failing debtor can prefer one creditor over another. (*Wyzard* v. *Goller, supra,* 23 Cal.App.4th at pp. 1188, 1190.) Civil Code section 3432, enacted in 1872, provides, "A debtor may pay one creditor in preference to another, or may give to one creditor security for the payment of his demand in preference to another." This is because " '. . . it is difficult to perceive how the payment of a debt which [is] justly owed, and which was past due, can be tortured into an act to hinder, delay, and defraud creditors[.]' [Citation.]" (*Wyzard, supra,* at p. 1188.) Therefore, a preferential transfer, made for proper consideration, although made with the recognition that the transfer

---

[1]Lyons's brief on appeal is replete with charges and allegations which had been left unsubstantiated in his opposition to the motion for summary judgment. For example, he argues, without reference to the record: "it cannot be overemphasized that the Bank and the Yuroseks *admit (as they have to)* that they agreed and worked together from and after April, 1990 to make Lyons pay the entire $2.35 million debt of RYLY Farms to the Bank, and then, after he had paid it in July, 1991, to hinder, delay and prevent him from collecting contribution from the Yuroseks for their two-thirds share." (Italics added.) Nowhere does the record support this allegation, and in fact, the opposite is borne out by the uncontroverted declarations and documentary evidence supporting the Bank's motion for summary judgment.

will prevent another creditor from collecting on his debt, "is not for that reason a transfer made to 'hinder, delay or defraud' " that creditor. (*Id.* at p. 1191.)

Lyons's theory fails because the undisputed facts here show that the $23 million debt and the Bank's lien on the Yuroseks' property as collateral thereto have already been finally adjudged valid and superior to Lyons's judgment lien. Thus, by enforcing its liens, the Bank did not take any action it was not already legally permitted to take. As a result, there can be no actionable conspiracy. (*Agnew* v. *Parks, supra,* 172 Cal.App.2d at p. 762.)

Lyons argues, Civil Code section 3432 notwithstanding, pursuant to Civil Code section 3439.04, subdivision (a) certain of the transfers here evoke the "badges of fraud" from which an inference of fraudulent intent may be drawn. The above stated rule that a debtor may prefer one creditor over another (Civ. Code, § 3432) has long been subject to exceptions based on fraud. (*Wyzard* v. *Goller, supra,* 23 Cal.App.4th at p. 1188.)

As aptly explained in *Wyzard,* California adopted the Uniform Fraudulent Transfer Act in 1986. (*Wyzard* v. *Goller, supra,* 23 Cal.App.4th at p. 1189.) California's version, codified in Civil Code section 3439 et seq. (Stats. 1986, ch. 383, § 2, pp. 1589-1590), was in effect at the time of the transfers in this case. With respect to fraudulent transfers, Civil Code section 3439.04 describes actual fraud in subdivision (a) which provides a fraudulent transfer is one which is made "With actual intent to hinder, delay, or defraud any creditor of the debtor." Subdivision (b), which describes constructive fraud, provides a fraudulent transfer is one which, under certain circumstances, is made "Without receiving a reasonably equivalent value in exchange" therefore.[2] (*Reddy* v. *Gonzalez* (1992) 8 Cal.App.4th 118, 122 [10 Cal.Rptr.2d 55].) Subdivision (a) is independent of section (b) and does not require proof of anything more than actual intent to defraud. (8 Cal.App.4th at p. 123.)

With respect to subdivision (a) of Civil Code section 3439.04, the Uniform Fraudulent Transfer Act contains a list of factors to be considered in

---

[2]The full text of section 3439.04 provides, "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: [¶] (a) With actual intent to hinder, delay, or defraud any creditor of the debtor. [¶] (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: [¶] (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or [¶] (2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

determining the presence of fraud. In enacting section 3439.04, the Legislature did not include that list of "badges of fraud." Instead, the legislative committee that considered the bill from which section 3439.04 was enacted decided to include in the official comments a list of some of the factors, the presence of one or more of which does not give rise to a presumption of fraud, but "is merely evidence from which an inference of fraudulent intent may be drawn." (Assem. Com. com., 12 West's Ann. Civ. Code (1995 pocket supp.) § 3439.04, p. 167; *Wyzard* v. *Goller*, *supra*, 23 Cal.App.4th at p. 1191.)

Here, while it is undisputed most of the factors do not exist,[3] Lyons argues two of such indicia of fraud are present: (1) the Bank was over-collateralized, and (2) the Bank failed to take possession of the Yuroseks' personalty.[4]

However, this contention does not raise a triable issue of fact precluding summary judgment. As explained above, it has already been judicially and finally determined that the Yuroseks' $23 million debt was *legitimate and preexisted* Lyons's judgment, and that the Bank's liens to secure that debt were valid and were superior to Lyons's judgment lien. (See, e.g., *Wyzard* v. *Goller*, *supra*, 23 Cal.App.4th at p. 1191.) Especially because at those hearings, Lyons raised the Bank's alleged fraud in taking the liens, it has been established as a matter of fact, that the Bank had not acted with fraudulent intent. Such determinations are res judicata.

Nor does it matter that the Bank failed to take possession of the Yuroseks' personalty. While the transfer of personalty is void if the creditor fails to

[3]The legislative committee listed the following as nonexclusive catalogue of the appropriate factors to consider in determining the existence of actual intent to hinder, delay, or defraud a creditor: (1) whether the transfer or obligation was to an insider; (2) whether the debtor had retained possession or control of the property transferred after the transfer; (3) whether the transfer or obligation was disclosed or concealed; (4) whether the debtor was sued or threatened with suit before the transfer was made or the obligation was incurred; (5) whether the transfer was of substantially all the debtor's assets; (6) whether the debtor has absconded; (7) whether the debtor has removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) whether the transfer had occurred shortly before or shortly after a substantial debt was incurred; (11) whether the debtor had transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor.

[4]Indeed, there is undisputed evidence contradicting Lyons's claim of fraudulent intent. Unlike *Reddy* v. *Gonzalez*, *supra*, 8 Cal.App.4th at pages 123-124, the court found sufficient evidence of actual fraud where the debtor conveyed the property specifically to protect it from creditors, here, it is undisputed as early as December 1991, the Bank agreed to discuss with the Yuroseks and Lyons settling the arbitration award on the $2,350,000 Renewal Note. Such agreement was reduced to writing in the Extension Agreement.

take possession of the property (Civ. Code, § 3440, subd. (a))[5] and such failure may be considered a badge of fraud (Assem. Com. com., 12 West's Ann. Civ. Code, *supra*, § 3439.04, p. 167), the contention here is specious: *there was never any time in which the Bank could have taken possession.* Soon after Michael and David Yurosek pledged the security and executed security agreements for the personalty, Lyons executed on his judgment, *seizing the exact personalty at issue.* Such property immediately became the subject of the third party claim and the marshalling motion which actions did not reach finality before a buyer for the Yurosek business was located, allowing the Yuroseks to pay Lyons their shares of the Renewal Note. Only after he was fully repaid did Lyons release his liens on the personalty, thereby affording the Bank the opportunity to take possession of the personalty. Stated otherwise, the personalty was in the possession of the sheriff until after the Bank had been fully repaid and the collateral was no longer necessary.

In sum, notwithstanding the Yuroseks' transfer of collateral may have worked a preference, Lyons simply cannot dispute the intent was lawful.

As an alternative basis for our holding, it is clear, as the Bank has noted, that Lyons cannot state causes of action in the first three counts, above analyzed, because *the alleged conspiracy has not damaged him.* Damages are an essential element of a cause of action for conspiracy. (*H & M Associates* v. *City of El Centro, supra,* 109 Cal.App.3d at p. 413.) The undisputed facts show, as a result of the Bank's taking over the business and finding a buyer for Yurosek, Inc., and agreeing to sell the company at a $4 million loss, *the Yuroseks were able to pay Lyons in full, with interest, what they owed him.* Hence, as a matter of law, summary judgment was proper as to the third element of the causes of action for conspiracy.

Reduced to its essence, this case represents an attempt to obtain additional money from the Yuroseks by recasting defendants' lawful actions as a conspiracy. The undisputed facts show, *notwithstanding his full recovery of contribution* plus interest from the Yuroseks for their portion of the $2,350,000 debt, *and notwithstanding the legitimacy of the underlying $23 million debt and the validity of the Bank's liens as collateral for that debt were already decided against Lyons,* he filed this action in an attempt to relitigate the same issue so as to recover *more money* from defendants. That the Yuroseks' obligation to Lyons was based on their joint and several liability on the Renewal Note does not affect the Bank's indisputed right to seek satisfaction from any one of the signatories. In the final analysis, foreclosing senior liens is not an act which can be transmuted into something illegal by

---

[5]In any event, the wine is exempt from this possession requirement. (Civ. Code, § 3440.1, subd. (d).)

"the pejorative plea of conspiracy." (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at p. 514.) Because the Bank's means and aims were lawful, there was no conspiracy. As a matter of law, summary judgment was proper.[6]

III. *The Trial Court's Rulings on Costs and Discovery Were Proper.*

[[/]]*

IV. *The Judgment of Nonsuit Was Proper.*

Summary judgment was correctly granted. [[/]]* Lyons was forced to proceed to trial on his complaint for conspiracy against one defendant entity. The judgment of nonsuit was therefore proper. (*Stewart* v. *Truck Ins. Exchange* (1993) 17 Cal.App.4th 468, 481 [21 Cal.Rptr.2d 338].)

DISPOSITION

The judgment is affirmed.

Croskey, Acting P. J., and Kitching, J., concurred.

A petition for a rehearing was denied November 30, 1995, and appellant's petition for review by the Supreme Court was denied January 30, 1996.

---

[6]For much the same reasons the trial court sustained the Yuroseks' demurrer, summary judgment was properly granted the Bank on count 2 for conspiracy to interfere with prospective economic advantage. As the Yuroseks cannot be held liable for interfering with the performance of their own contract with Lyons, no conspiracy between the Bank and the Yuroseks for tortious interference with contractual relation will lie. (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at p. 514.)

*See footnote, *ante*, page 1001.