[No. A105488. First Dist., Div. Four. May 31, 2005.]

BORDERS ONLINE, LLC, Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

**COUNSEL**

Scott L. Brandman; Baker & McKenzie, J. Pat Powers and Andrew P. Crousore for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Randall P. Borcherding and David Lew, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**RIVERA, J.**—We face with increasing frequency issues at the junction of Internet technology and constitutional principles. This is another such case.

Borders Online, LLC (Online), a Delaware company, sold more than $1.5 million in merchandise over the Internet to California consumers in 1998 and 1999. Online's Web site included a notice that any goods purchased from Online could be returned to any Borders Books and Music store (Borders store). Under the policy of Borders, Inc. (the owner of Borders stores), customers could exchange the items or receive a credit card refund. Numerous Borders stores are located all over California. Borders, Inc. (Borders) and Online also engaged in incidental cross-marketing practices to benefit the Borders brand. Online and Borders are affiliated through a common parent company but are distinct corporate entities.

The State Board of Equalization (Board) determined that Borders was Online's representative operating in the state "for the purpose of selling" Online's goods, and therefore Online was required to collect and remit a use tax from its California customers for the period April 1, 1998, through September 30, 1999 (the disputed period). (*In the Matter of the Petn. for Redetermination Under the Sales and Use Tax Law of: Borders Online, Inc.* (Sept. 26, 2001) [2000–2003 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 403-191, pp. 29,971, 29,972, 29,974 (Board's *Borders* Opn.).) The primary questions posed by this appeal are whether Borders's activities on behalf of Online were "for the purpose of selling" Online's goods and whether, through Borders, Online had a sufficient presence in the state to justify the imposition of the tax collection burden. The trial court, on summary judgment, ruled in favor of the Board. Online challenges the ruling on the merits and argues the case should have gone to trial. We conclude the trial court's determination was correct, and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Online is a limited liability corporation formed under Delaware law in 2001 with headquarters in Michigan.[1] From April 1998 to September 1999, Online sold books, book accessories, magazines, compact discs, videotapes, and similar tangible goods over the Internet to customers, including customers in California. It did not own or lease property in California during the disputed period and did not have any employees or bank accounts in the state. Online employees located outside California received and processed all

---

[1] Online is the successor in interest to Borders Online, Inc. Both appellant and Borders Online, Inc., are referred to collectively as Online.

orders placed through Online's Web site, Borders.com. Online neither collected tax from its California purchasers nor paid sales or use taxes to the Board for its sales to California purchasers during the disputed period.

Online was wholly owned by Borders Group, Inc. Borders Group, Inc., also owns Borders, which, in turn, owns Borders stores. Numerous Borders stores are located throughout California and in other states. Borders stores sell merchandise that is comparable to the goods sold by Online over the Internet. Receipts at Borders stores sometimes contained the phrase "Visit us online at www.Borders.com." Although Borders stores did not have facilities to assist customers wishing to place orders with Online, Borders's employees were encouraged to refer customers to Online. Visitors to Online's Web site could access a "link" to Borders's Web site, www.bordersstores.com, which provided advertising and promotional information for Borders stores, including a list of store locations.

Two people who served on Online's board of directors also served on Borders's three-person board of directors during the disputed period. All but two of the nine people who served as officers of Online during the disputed period, including the two people who served as president in 1998 and 1999, also served as officers of Borders at some point during the disputed period. Borders and Online shared a similar logo. They also shared some financial and market data but did not intermingle their corporate assets. Borders and Online filed their tax returns on the combined report basis pursuant to Revenue and Taxation Code[2] section 25101 et seq.

Online's California sales increased each quarter during the disputed period:

| Period | California Sales |
|---|---|
| 2d Quarter 1998 | $40,176.92 |
| 3d Quarter 1998 | $139,897.16 |
| 4th Quarter 1998 | $248,294.13 |
| 1st Quarter 1999 | $361,205.97 |
| 2d Quarter 1999 | $365,988.29 |
| 3d Quarter 1999 | $500,451.29 |

From September 30, 1998, to August 11, 1999, Online posted the following return policy on its Web site: "You may return items purchased at Borders.Com to any Borders Books and Music store within 30 days of the date the item was shipped. All returns must be accompanied by a valid packing slip (your online receipt and shipping notification are not valid substitutes for a packing slip on returns to stores). Gift items may be returned

---

[2] All statutory references are to the Revenue and Taxation Code unless otherwise specified.

or exchanged if they are accompanied by a valid gift packing slip. You may not return opened music or video items, unless they are defective." Any merchandise returned to Borders pursuant to this policy was either absorbed into Borders's own inventory or disposed of. Borders did not charge Online for accepting returns of Online's merchandise. Borders also accepted returns of saleable merchandise presented without a receipt (including merchandise purchased from competitor retailers) for store credit, provided that Borders carried the returned items. However, exchanges or credit card refunds for returned items were routinely provided only to Borders and Online customers with receipts or packing slips.

On July 29, 1999, the Board sent a letter to Online stating the company was required to collect and remit use taxes on all sales to California purchasers because Online's affiliate Borders acted as Online's agent by accepting return merchandise. Section 6203, subdivision (a) requires retailers "engaged in business in this state" to collect and pay a use tax. In stating its opinion that Online was required to pay a use tax, the Board relied on section 6203, subdivision (c)(2) (§ 6203(c)(2)), which defines " '[r]etailer engaged in business in this state' " as "[a]ny retailer having any representative, agent, salesperson, canvasser, independent contractor, or solicitor operating in this state under the authority of the retailer or its subsidiary for the purpose of selling, delivering, installing, assembling, or the taking of orders for any tangible personal property." The Board reasoned that Online was "engaged in business in California" because Borders was "acting as an agent by accepting return merchandise on behalf of [Online] as defined in [the company's] Web site return policy."

Online removed its return policy message from its Web site on August 11, 1999. The Board continued to regard Online as a retailer engaged in business in California, however, and again wrote to the company on October 25, 1999, stating Online was required to collect and pay state use tax. On January 27, 2000, the Board issued a notice of determination to Online for unpaid use taxes, plus interest and penalties, for Online's sales to California purchasers during the disputed period.

Online filed a petition for redetermination, which the Board denied in a memorandum opinion. (Board's *Borders* Opn., *supra*, Cal. Tax Rptr. (CCH) ¶ 403-191 at p. 29,974.) The Board found that Online was covered by section 6203(c)(2) because (1) Borders was Online's authorized representative in California for the purpose of accepting returns from Online's California customers, and (2) the taking of returns constituted "selling" for purposes of the statute. (Board's *Borders* Opn., at pp. 29,973–29,974.) In so ruling, the Board held that "selling" includes "all activities that are an integral part of making sales." (*Id.* at p. 29,974.) The Board reasoned that Online's favorable

return policy was designed to induce potential customers who might otherwise not make an online purchase to place orders, and thus the policy was "integral" to selling in e-commerce transactions. (*Ibid.*) The Board also ruled that Online had a sufficient physical presence in California (through Borders) to satisfy the commerce clause of the United States Constitution. (*Ibid.*)

On November 5, 2001, the Board issued a notice of redetermination to Online for unpaid use taxes, plus interest (but not penalties) for the company's sales to California purchasers. Online paid $167,667.78 to the Board and then timely submitted a claim for refund, which the Board denied. After exhausting its administrative remedies, Online filed a complaint in San Francisco Superior Court seeking a refund. Its complaint alleged it was not a California retailer and therefore was not required to pay taxes under state law and claimed the commerce clause prohibited imposing taxes on the company.

The Board filed a motion for summary judgment, and the trial court granted the motion. The court held that (1) Online was covered by section 6203(c)(2) because of Online's policy providing for returns at Borders stores, (2) the imposition of a tax on Online did not violate the commerce clause, and (3) the fact that Online's return policy was not posted on its Web site during the entire disputed period did not affect the conclusion that Online had a sufficient physical presence in California to support a finding of "substantial nexus." The trial court entered judgment on November 26, 2003, and Online timely appealed.

## II. DISCUSSION

### A. *Standards on Summary Judgment*

■ "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) Summary judgment is proper only where there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar, supra,* 25 Cal.4th at p. 843.) There is a triable issue of material fact only if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar,* at p. 850.) ■ The party moving for summary judgment generally "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the

opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*) Thus, once a defendant has made a prima facie showing, the plaintiff must then "set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2); see also *Aguilar*, *supra*, 25 Cal.4th at pp. 850–851.) To meet this burden, the plaintiff must produce admissible evidence. (See *Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1013–1014 [48 Cal.Rptr.2d 174] (*Lyons*) [promise to prove facts at a later date insufficient to oppose summary judgment]; *Compton v. City of Santee* (1993) 12 Cal.App.4th 591, 595–596 [15 Cal.Rptr.2d 660] (*Compton*) [party opposing summary judgment must produce admissible evidence raising a triable issue of fact; "mere speculation and conjecture" insufficient].)

■ On appeal, we review the trial court's grant of summary judgment de novo, applying the same standards that governed the trial court. (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925 [68 Cal.Rptr.2d 571].) We consider all of the evidence the parties offered in connection with the motion, except that which the court properly excluded, and the uncontradicted inferences the evidence reasonably supports. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313].)

B. *Online Is Subject to California's Use Tax*

■ A use tax on interstate sales is "a tax on the privilege of use of property by the buyer" who purchases goods that would not otherwise be subject to a sales tax. (9 Witkin, Summary of Cal. Law (9th ed. 1989) Taxation, § 79, p. 100.) California imposes a use tax "on the storage, use, or other consumption in this state of tangible personal property purchased from any retailer . . . for storage, use, or other consumption in this state . . . ." (§ 6201.) The tax is paid by the purchaser but is collected by the retailer. (§§ 6202, subd. (a), 6203, subd. (a).[3]) A retailer that fails to collect the appropriate use taxes becomes indebted to the state for the amount owed. (§ 6204.)

Both parties agree this case is governed by section 6203(c)(2) (defining " '[r]etailer engaged in business in this state' "), *ante*, but disagree

---

[3] Section 6203, subdivision (a) provides that "every retailer engaged in business in this state and making sales of tangible personal property for storage, use, or other consumption in this state . . . shall, at the time of making the sales or, if the storage, use, or other consumption of the tangible personal property is not then taxable hereunder, at the time the storage, use, or other consumption becomes taxable, collect the tax from the purchaser and give to the purchaser a receipt therefor . . . ."

as to whether the statute applies to Online. The question, then, is whether Online had a "representative" or "agent" in California acting "under the authority of" Online for the purpose of "selling" personal property. (§ 6203(c)(2).)[4]

### 1. *Borders Acted Under Online's Authority As Its Agent*

The trial court found that Online's return policy posted on its Web site provided "undisputed evidence" "confirm[ing]" that Borders was [Online's] authorized agent or representative for the purpose of accepting returns of Online merchandise from California purchasers." It held this finding was supported by the fact that (1) each Borders store in the state would accept returns and provide a refund, store credit or exchange of Online's merchandise; (2) Borders encouraged its store employees to refer customers to Online's Web site; and (3) receipts at Borders stores sometimes invited patrons to "Visit us online at www.Borders.com." (Underscoring omitted.) The trial court concluded, "Borders' practice of providing unique and preferential services to Online purchasers by offering cash refunds to any purchaser of Online merchandise who wanted one, when it could refuse to do so for customers of Online's competitors, indicates that Borders provided such preferential services because it was Online's authorized agent or representative."

■ Online claims the trial court erred in ruling as a matter of law that Borders was Online's agent because issues of agency typically are questions of fact. It is true that "[t]he existence of an agency relationship is usually a question of fact, *unless the evidence is susceptible of but a single inference.* [Citations.]" (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 619 [20 Cal.Rptr.2d 358], italics added (*Violette*).) Here, the undisputed evidence is susceptible of but one inference—that Borders was acting as Online's authorized agent or representative.

**(6)** A representative is "[o]ne who stands for or acts on behalf of another." (Black's Law Dict. (7th ed. 1999) p. 1304, col. 2.) " 'An agent is one who represents another, called the principal, in dealings with third persons.' (Civ. Code, § 2295.)" (*Scholastic Book Clubs, Inc. v. State Bd. of Equalization* (1989) 207 Cal.App.3d 734, 737 [255 Cal.Rptr. 77] (*Scholastic*).) An agency relationship "may be implied based on conduct and circumstances." (*Id.* at pp. 737–738.) In *Scholastic*, cited by the trial court, the appellant was an out-of-state mail order book seller that had no physical

---

[4] The Board apparently does not argue Online had an authorized agent in California for the purpose of "delivering, installing, assembling, or . . . taking orders" of personal property. (§ 6203(c)(2).) Likewise, there is no dispute that Online is a "retailer" for purposes of the statute. (*Ibid.*)

presence in California. (*Id.* at p. 736.) It mailed catalogs to teachers, who distributed offer sheets to students and then forwarded orders to the appellant. (*Ibid.*) The appellant claimed, as Online does here, it was not subject to California's use tax because the teachers were not acting as its agents or representatives. (*Id.* at p. 737.) The court disagreed and held the teachers were acting under the appellant's authority, based on the fact that "[b]y accepting the orders, the payment and shipping the merchandise, appellant clearly and unequivocally ratified the acts of the teachers and confirmed their authority as appellant's agents or representatives." (*Id.* at p. 738.) Likewise here, there is no dispute either that Online announced on its Web site that Borders was authorized to accept Online's merchandise for return, or that Borders would provide customers with an exchange, store credit, or a credit card credit. By accepting Online's merchandise for return, Borders acted on behalf of Online as its agent or representative in California.

■ Online claims the trial court erred in holding Borders was Online's agent because it failed to apply what it refers to as California's "four-factor test" to review the agency issue. It insists an agency relationship exists only if (1) the agent has power to alter legal relationships of the principal, (2) the agent acts as the fiduciary of the principal, (3) the principal can control the agent, and have considered (4) the agent consents to act as the principal's agent. While it is true courts consider these factors when considering agency issues in various contexts, there is no bright-line "four-factor test" in determining agency. Online overstates its position in claiming the trial court erred by "failing to apply" such a test.

Indeed, the cases Online relies on to advocate the existence of the so-called "four-factor test" were decided in other contexts, analyzed far different factual situations, and did not necessarily apply each of the four "factors" cited by Online. (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1580 [36 Cal.Rptr.2d 343] [written agreements regarding billing and collection services created agency relationship between two doctors]; *Violette, supra,* 16 Cal.App.4th at p. 620 [no agency relationship created between social acquaintances merely because one made suggestion to another]; *St. Paul Ins. Co. v. Industrial Underwriters Ins. Co.* (1989) 214 Cal.App.3d 117, 123 [262 Cal.Rptr. 490] [no agency relationship created when driver took car for a test drive]; *Alvarez v. Felker Mfg. Co.* (1964) 230 Cal.App.2d 987, 999–1000 [41 Cal.Rptr. 514] [relationship at issue was that of buyer-seller].)[5]

---

[5] Online likewise relies on cases in its analysis of the fiduciary duty "factor" that do not reference such a four-factor test. Most of these cases were not decided in the context of determining agency and thus are inapposite. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 222 [197 Cal.Rptr. 783, 673 P.2d 660] [buyer and seller not ordinarily in fiduciary relationship]; *Estate of Sanders* (1985) 40 Cal.3d 607, 616–617 [221 Cal.Rptr. 432, 710 P.2d 232] [executor of estate has fiduciary relationship with

Online also claims that although the trial court relied on a quotation from *Scholastic*, it disregarded the "four-factor test" that was applied in that case. To the contrary, *Scholastic* addressed only the appellant's authority over the teachers who took orders because of their " 'power' " and " 'authority' " to solicit orders. (*Scholastic, supra,* 207 Cal.App.3d at pp. 737–738 & fn. 1.) The court did not refer to a "four-factor test" but, instead, analyzed the particular facts of that case. (*Id.* at pp. 736–738.)

■ Online claims it had no "control" over Borders's action but does not dispute that Borders implemented the return policy posted on Online's Web site. Online also notes there was no written agreement between Online and Borders, but "[t]he creation of an agency relationship is not dependent upon the existence of a written agreement." (*Scholastic, supra,* 207 Cal.App.3d at p. 737.) In fact, "[t]he relationship may be implied based on conduct and circumstances [citations], as well as by ratification." (*Id.* at pp. 737–738.) It therefore does not matter, as Online claims, that Borders did not have the subjective belief it was Online's agent. ■ By accepting Online's merchandise under the terms of Online's return policy, Borders was effectuating Online's policy, even if it was also Borders's own policy. The undisputed facts show Borders acted as Online's agent or representative and therefore Online meets the first part of section 6203(c)(2)'s definition of " '[r]etailer engaged in business in this state,' " as a "retailer having [a] representative [or] agent . . . operating in this state . . . ."

■ Online contends, however, that the trial court denied it "an opportunity" to present evidence that there was no agency relationship between Online and Borders during the period in controversy. In making this argument, instead of identifying genuine conflicts in the evidence presented to the trial court, Online points to an *absence* of evidence and argues the trial court should not have granted summary judgment "[w]ithout a [f]ully [d]eveloped [r]ecord." But Online does not explain why it declined to present such evidence to the trial court in connection with its opposition after the Board had shown that Borders stores accepted returns of Online's merchandise and that Borders referred customers to Online. A party's failure to offer necessary evidence in opposition to a motion for summary judgment is not a legitimate reason to attack the summary judgment on appeal. (See *Lyons, supra,* 40

---

people who have interest in estate]; *Barbara A. v. John G.* (1983) 145 Cal.App.3d 369, 382 [193 Cal.Rptr. 422] [whether attorney who impregnates client was acting as a fiduciary in personal relations with client]; *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1034–1035 [117 Cal.Rptr.2d 685] [attorney violated fiduciary relationship by acting contrary to client's interests].)

Cal.App.4th at pp. 1013–1014; *Compton, supra,* 12 Cal.App.4th at pp. 595–596.)[6]

 Specifically, Online claims there is no evidence regarding several "issues of material fact relating to the agency analysis"; it argues there was no evidence regarding the extent of returns of Online merchandise to Borders during the disputed period, no evidence that Borders employees ever referred customers to Online's Web site, and no evidence that Online's sales in California were benefited by the return policy or by the printing of "Visit us online at www.Borders.com" on customer receipts. Again, however, Online cannot simply point to an absence of evidence to avoid summary judgment; rather, once a defendant has made a prima facie showing, the plaintiff must then "set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar, supra,* 25 Cal.4th at pp. 850–851 [after burden shifts, party opposing summary judgment has burden of production to make prima facie case that triable issues of fact exist].) This is especially true where, as here, for example, Borders did not track the extent of returns of Online merchandise, thereby making it impossible for the Board to provide the evidence Online claims should have been produced. Thus, we conclude the trial court correctly determined Borders acted as Online's agent for purposes of section 6203(c)(2).[7]

### 2. *Borders Was "Selling" for Purposes of Section 6203(c)(2)*

The trial court concluded that by providing refunds and exchanges to Online's customers pursuant to Online's return policy, Borders was engaged in "selling" as that term is used in section 6203(c)(2). The court reasoned that "the term 'selling' may properly be defined to include all activities that constitute an integral part of inducing sales. Such a definition fairly captures the common understanding of this term."

The term "selling" is not defined in the statute. The Board construed the term to include "all activities that are an integral part of making sales," and concluded that this interpretation accords with its "common usage." (Board's

---

[6] Online does not claim that it sought a continuance to permit additional necessary discovery because there were "facts essential to justify opposition" that existed but could not yet be presented. (Code Civ. Proc., § 437c, subd. (h).)

[7] Online further claims the issue of whether Online and Borders were a "unified retail enterprise" during the disputed period is legally irrelevant but goes on to argue that assuming the issue is relevant, the question is "an issue of fact." Online claims the trial court's erroneous conclusion that there were no triable issues was "based, in part, on the inference that Online and Borders constituted a unified retail enterprise." We see no such inference in the record. Moreover, we agree that the issue is irrelevant to our resolution of this case. Accordingly, whether this was a disputed factual issue, as argued by Online, or a legal argument, as characterized by the trial court, is of no moment.

*Borders* Opn., *supra*, Cal. Tax Rptr. (CCH) ¶ 403-191 at p. 29,974.) The Board reasoned, "When out-of-state retailers that make offers of sale to potential customers in California authorize in-state representatives to take returns, these retailers acknowledge that the taking of returns is an integral part of their selling efforts. Such an acknowledgement comports with common sense because the provision of convenient and trustworthy return procedures can be crucial to an out-of-state retailer's ability to make sales. This is especially evident in the realm of e-commerce." (*Ibid.*) Online, by contrast, proposes the term "selling" be narrowly defined as "the act of making a sales transaction."[8]

 Although this court independently determines the meaning of a statute, if an agency charged with administering the statute issues its own interpretation, we will give due consideration to that construction. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).) Here, the Board is responsible for administering the applicable statutes. (§ 7051.) The weight to be given the Board's interpretation depends upon " 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " (*Yamaha*, at pp. 14–15, italics omitted, quoting *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 [89 L.Ed. 124, 65 S.Ct. 161].)

We think the Board's interpretation of the term "selling" is persuasive. The Board appears to have thoroughly considered the meaning of the term, and its reasoning that the act of "selling" encompasses offering other inducements to purchase is consistent with at least one later pronouncement. (Board's *Borders* Opn., *supra*, Cal. Tax Rptr. (CCH) ¶ 403-191 at p. 29,974; *In the Matter of the Petn. for Redetermination Under the Sales and Use Tax Law of Barnes & Noble.Com* (Sept. 12, 2002) [2000–2003 Transfer Binder] Cal. Tax Rptr. (CCH) ¶ 403-325, pp. 30,447, 30,450 [bookstore's distribution of discount coupon on behalf of affiliated Internet retailer was integral to selling efforts and thus constituted "selling"].) In contrast, Online's narrow interpretation would mean that even if a local representative were to provide dramatic incentives to California customers to purchase the out-of-state retailer's goods, no tax could be imposed unless the representative is actually involved in the solicitation of the sale or the sale transaction itself. We agree with the Board that Online's return policy undoubtedly made purchasing

---

[8] Online makes a passing argument that the statutory terms "delivering," "installing," "assembling," and "taking of orders" would also be integral parts of "selling" as that term is broadly defined by the Board and therefore the Board's construction of section 6203(c)(2) would render those terms surplusage, contrary to accepted rules of statutory construction. But as the Board points out, Online's own definition of "selling" would include, at the very least, the "taking of orders" and the "deliver[y]" of the merchandise as part of the sales transaction.

merchandise on its Web site more attractive to California customers, as they would know that returning or exchanging any unwanted items would be far simpler than if they purchased items from an e-commerce retailer with no presence in California.

Online contends this conclusion is a "theory of marketing without evidentiary support from the record" and that, as a factual matter, the policy was meant to benefit Borders, not Online. It also claims there was no evidence in the record that the return policy actually induced customers to purchase from Online. In effect, Online is contending the Board did not present a prima facie case that the returns-to-Borders-stores policy was an integral part of Online's sales activities. We disagree.

The Board concedes it bears the initial burden of demonstrating that Online's return policy was implemented for the purpose of selling goods in California. It argues, however, that it need not prove the buyers' motives because it is the intent of the seller that is relevant. (See § 6203(c)(2) ["[a]ny retailer having any representative . . . operating in this state . . . for the purpose of selling . . . property" is a " '[r]etailer engaged in business in this state' "].) The return policy manifestly was not put in place to maximize *returns* of Online's merchandise, and Online does not contend otherwise. Therefore, the Board concludes, the only reasonable inference is that the policy was created for the purpose of inducing *sales* in California. This conclusion rests on the logical inferences that at least some online consumers will not place orders if the retailer does not provide a return policy "worthy of confidence" and therefore Online's ability to offer these potential customers "convenient returns and exchanges at nearby reputable 'brick-and-mortar' stores . . . would assuredly help promote such confidence." (Board's *Borders* Opn., *supra*, Cal. Tax Rptr. (CCH) ¶ 403-191 at p. 29,974.) Further, with respect to customers who are not satisfied with their purchases, "[a]n online retailer that offers convenient, local return and exchange options is much more likely to obtain repeat business from such purchasers." (*Ibid.*)

We think these compelling inferences, drawn from the undisputed facts, are sufficient to present a prima facie case, shifting the burden to Online to present evidence (or to argue contrary inferences) and thus create a triable issue of fact. Online did not do so. Instead, it merely argued that the Board's definition of "selling" was overbroad, and that Borders's actions on Online's behalf did not constitute "selling." Online now contends that the trial court denied it the opportunity to present evidence that its return policy was not a cause of sales increases in 1998. It states that it planned to produce evidence *at trial* that would refute the Board's analysis and demonstrate the return policy was established for reasons unrelated to "inducing sales," and asks us to refrain from deciding the case without a "fully developed record." But the

time to present such evidence was at the summary judgment motion. Even assuming we would prefer a more fully developed record, we have no authority to remand the cause for further proceedings absent a finding of error.

As to the merits, Online cannot seriously dispute that its return policy made its Web site more appealing to potential customers. One of the documents Online produced to the Board—apparently an information sheet prepared for Borders's employees—described Online as "an extension of the Borders brand" and touted the reciprocal benefits of cross-referrals: "If we don't refer customers to Borders.com, those interested in purchasing online will go to Amazon or barnesandnoble.com. Additionally, well under 5% of visitors to the site purchase online, but 100% receive a message about the Borders brand and will experience our active promotion of Borders stores. As your store experience can attest to, customers come into Borders looking for items they've seen online. We think Borders.com can complement Borders stores' business and vice versa." Even if the return policy also benefited Borders, that does not mean the policy was any less attractive to Online's customers. Whatever the subjective intent of Online or its individual customers, the Board's conclusion that Online's return policy is integral to making sales because of its attractiveness, convenience, and trustworthiness is persuasive, especially in the context of e-commerce. (*Yamaha, supra*, 19 Cal.4th at pp. 14–15.)[9]

Our analysis is reinforced by the fact that Online's return policy contemplates that "sales" may take place pursuant to the policy. The Legislature has defined " '[s]ale' " for purposes of the state's use tax as including "[a]ny transfer of title or possession, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration." (§ 6006, subd. (a).) Borders was authorized to provide Online's customers with store credit that could be used for the future purchase of Borders merchandise. Borders also would exchange Online's merchandise for its own merchandise. Either transaction certainly falls within the Legislature's definition of " '[s]ale' " under section 6006, subdivision (a). When considered in tandem with other cross-selling techniques, such as Borders's employees referring customers to Online and Borders's receipts printed with the message "Visit us online at www.Borders.com," the Board's conclusion that Borders was Online's representative "for the purpose of selling" Online's goods is a correct application of the law.

---

[9] Online also contends that the summary judgment prevented it from presenting "further evidence" it planned to introduce at trial to show that return policies of this type are common in the retail industry and are "widely known" to generate business in the store receiving the returns. But, again, Online's tactical decision not to produce this evidence in opposition to the Board's motion does not provide a valid ground for attacking a summary judgment. (*Lyons, supra*, 40 Cal.App.4th at pp. 1013–1014; *Compton, supra*, 12 Cal.App.4th at pp. 595–596.)

C. *The Trial Court's Ruling Is Consistent with the Commerce Clause*

■ It is well settled that under the commerce clause, there must be a sufficient connection between a state and a retailer in order for the state to impose a use tax on the seller's goods. (*Scripto v. Carson* (1960) 362 U.S. 207, 210–211 [4 L.Ed.2d 660, 80 S.Ct. 619] (*Scripto*) [upholding imposition of Florida use tax on Georgia company where 10 jobbers in Florida were responsible for soliciting and submitting orders].) This nexus prevents states from otherwise imposing impermissible burdens on interstate commerce. (*Id.* at p. 212; see also *Quill Corp. v. North Dakota* (1992) 504 U.S. 298, 312–313 [119 L.Ed.2d 91, 112 S.Ct. 1904] (*Quill*).) A tax passes constitutional muster only if it is applied to " 'an activity with a substantial nexus with the taxing State.' " (*Quill, supra,* 504 U.S. at p. 311, quoting *Complete Auto Transit, Inc. v. Brady* (1977) 430 U.S. 274, 279 [51 L.Ed.2d 326, 97 S.Ct. 1076].)

■ In *Quill*, the United States Supreme Court reversed an opinion of the North Dakota Supreme Court that permitted a tax on a mail-order business with no physical presence in the state. (*Quill, supra,* 504 U.S. at pp. 301–302.) Confirming the "bright-line" rule articulated in *Nat. Bellas Hess v. Dept. of Revenue* (1967) 386 U.S. 753, 758 [18 L.Ed.2d 505, 87 S.Ct. 1389] (*Bellas Hess*), the *Quill* court held that a use tax is impermissible where a seller's only connection with a particular state is orders placed and merchandise delivered through a common carrier or the United States mail; a seller must have a physical presence in a state to satisfy the commerce clause. (*Quill, supra,* 504 U.S. at pp. 301, 317–318.) As the United States Supreme Court has observed, " 'the crucial factor governing nexus is whether the activities performed in [the] state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in [the] state for the sales.' " (*Tyler Pipe Industries v. Dept. of Revenue* (1987) 483 U.S. 232, 250 [97 L.Ed.2d 199, 107 S.Ct. 2810] (*Tyler Pipe*) [in-state sales representatives engaged in substantial activities in Washington to help out-of-state piping company's business in that state].) Online does not dispute it established and maintained a robust market for sales in California. The question is whether the record satisfies the remainder of the test, i.e., that the activities performed by Borders on its behalf were " 'significantly associated with [Online's] ability to establish and maintain' " its California market. (*Ibid.*) We conclude that they were.[10]

---

[10] At oral argument Online's counsel cited *Quill* as stating that *Scripto* constituted the furthest extension of the *power to tax.* Actually, *Quill* described *Scripto* as the furthest extension of the power to tax based upon physical presence under the *due process clause* up to the point that *Bellas Hess* was decided in 1967. (*Quill, supra,* 504 U.S. at pp. 306–307.) The court in *Quill* went on to state, however, "Our due process jurisprudence has evolved substantially in the 25 years since *Bellas Hess* . . . . [W]e have abandoned more formalistic tests that focused on a defendant's 'presence' within a State in favor of a more flexible inquiry

As an initial matter, we address Online's position that a state has no authority to impose a tax collection duty on an out-of-state retailer unless its in-state representative is "actually making sales transactions" as was the case in *Scripto*, *Tyler Pipe* and *Scholastic*. Online's formulation of the test is too constricted. The pivotal question when testing a state's taxing authority against the dormant commerce clause is not whether the foreign company has agents soliciting sales in the state. The question, rather, as articulated in *Tyler Pipe*, is whether the activities of the retailer's in-state representatives are " 'significantly associated with [its] ability to establish and maintain a market in [the] state for the sales.' " (*Tyler Pipe, supra,* 483 U.S. at p. 250.) While the cases assess a combination of activities that often include solicitation or sales, the analysis turns on the totality of the activities undertaken to maintain a successful market. Thus, for example, in *Standard Steel Co. v. Wash. Revenue Dept.* (1975) 419 U.S. 560 [42 L.Ed.2d 719, 95 S.Ct. 706], the Supreme Court upheld Washington's imposition of a tax on the gross receipts of an out-of-state retailer from goods sold in the state to its principal customer (Boeing) based upon the presence of a single employee who solicited no sales, but whose duty it was to consult with Boeing regarding its anticipated needs and requirements for the seller's goods and to follow up on any difficulties in the use of those goods. Similarly, in *Town Crier, Inc. v. Department of Revenue* (2000) 315 Ill.App.3d 286, 289 [733 N.E.2d 780, 782, 248 Ill.Dec. 105], the court upheld Illinois's imposition of a tax on a Wisconsin furniture retailer because the retailer had entered Illinois on various occasions to deliver merchandise and install window dressings, and the retailer was garnering half of its gross sales from Illinois customers. In reasoning similar to that of the Board in this case, the court concluded: "By making deliveries into Illinois in its own vehicles, plaintiff has established a regular presence in Illinois that enhanced its ability to establish and maintain a market for its furniture sales. . . . By repeatedly making deliveries and performing installations in Illinois, plaintiff's presence was demonstrably more than slight." (*Id.* at p. 786; and see *Dept. of Revenue v. Care Computer Systems* (2000) 197 Ariz. 414, 416–417 [4 P.3d 469, 471–472] [retailer had one salesman in Arizona approximately two days per year and provided an average of approximately 20 days of training per year to Arizona customers; although cost of training was insignificant compared to cost of hardware and software shipped from out of state, court found sufficient presence to support retail transaction privilege tax].) In contrast, courts have found insufficient

---

into whether a defendant's contacts with the forum made it reasonable, in the context of our federal system of Government, to require it to defend the suit in that State." (*Id.* at p. 307.) The court concluded: "Thus, to the extent that our decisions have indicated that the Due Process Clause requires physical presence in a State for the imposition of duty to collect a use tax, we overrule those holdings as superseded by developments in the law of due process." (*Id.* at p. 308.) As we have noted, however, the court reaffirmed the rule that a seller must have a physical presence in the state to satisfy the *commerce clause.* (*Id.* at pp. 317–318.)

presence where the out-of-state seller sent technicians into the taxing state an average of three times (about 11 hours) per year to perform electronic wiring for installing the device sold. (*In re Appeal of Intercard, Inc.* (2000) 270 Kan. 346, 347, 363–364 [14 P.3d 1111, 1113, 1122–1123] (*Intercard*).) These contacts were considered "isolated, sporadic, and insufficient to establish a substantial nexus to Kansas." (*Id.* at pp. 1122–1123; see also *Dept. of Revenue v. Share International* (Fla. 1996) 676 So.2d 1362, 1363 [out-of-state mail order company displayed and sold wares at a seminar in Florida, attended primarily by individuals from outside Florida, three days per year; insufficient nexus to tax goods sold in Florida through mail order].)

 Of particular interest is the elucidation of this issue by New York's highest court in *Orvis Co. v. Tax Tribunal* (1995) 86 N.Y.2d 165 [654 N.E.2d 954, 630 N.Y.S.2d 680] (*Orvis*). After conducting an in-depth review of commerce clause jurisprudence before and after *Quill*, the court concluded that the Supreme Court in *Quill* had reluctantly reaffirmed the bright-line *Bellas Hess* rule—requiring *some* physical presence to support taxation—while at the same time endorsing a more flexible approach of later commerce clause jurisprudence in which "the *quid pro quo* for State taxation could be found in the benefits and protections the State confers in providing for a stable and secure legal-economic environment for a mail-order vendor's substantial marketing efforts aimed at the taxing State." (*Orvis*, at p. 175.) Accordingly, the New York court articulated the commerce clause standard in this way: "While a physical presence of the vendor is required, it need not be substantial. Rather, it must be demonstrably more than a 'slightest presence' [citation]. And it may be manifested by the presence in the taxing State of the vendor's property or the conduct of economic activities in the taxing State performed by the vendor's personnel or on its behalf." (*Id.* at p. 178.) Although other courts have disagreed with this interpretation of *Quill* (see, e.g., *Intercard, supra,* 14 P.3d at pp. 1118–1120), we think *Orvis* is more in keeping with the realities of 21st century marketing and technology, which increasingly affords opportunities for out-of-state vendors to establish a strong economic presence in California, utilizing California's "legal-economic environment," while maintaining only a minimal or vicarious presence here.

 Thus, in *Orvis*, an out-of-state seller of computer hardware and software included in its sales agreement a promise to provide one on-site visit should problems arise within 60 days of the sale. The taxing authority's audit revealed that there had been 41 such trouble-shooting trips made to New York during a three-year period in which 154 sales transactions had been made to New York customers. The court concluded that this provided ample support

for the tax tribunal's findings that the "trouble-shooting visits to New York vendees and its assurances to prospective customers that it would make such visits enhanced sales and significantly contributed to [the vendor's] ability to establish and maintain a market for the computer hardware and software it sold in New York. [The vendor's] activities in New York were, thus, definite and of greater significance than merely a slightest presence [citation]." (*Orvis, supra*, 86 N.Y.2d at pp. 180–181.) In sum, there is no requirement that the out-of-state retailer's in-state representative be engaged in the solicitation of sales or in sales transactions to satisfy the substantial nexus required by the commerce clause. We turn now to application of the nexus requirement to the undisputed facts before us.

We have already determined that Online's return policy was part of its strategy to build a market in California. We further note that Borders's efforts on Online's behalf were not limited to accepting returns from—and providing exchanges and credit card refunds to—Online customers. Borders's receipts were sometimes imprinted with "Visit us online at www.Borders.com," and Borders's employees were encouraged to refer customers to Online to find merchandise not available at Borders stores. The cross-selling synergy was also maintained by the use of similar logos, by the link to Borders' Web site from Online's Web site, and by the sharing of some market and financial data between the two entities. Online generated more than $1.5 million in sales in California in 18 months. These facts amply support the conclusion that Online had a representative with a physical presence in the State and the representative's activities were " 'significantly associated with [Online's] ability to establish and maintain a market in [the] state for the sales.' " (*Tyler Pipe, supra*, 483 U.S. at p. 250.)

Online contends the trial court's conclusion is inconsistent with *SFA Folio Collections, Inc. v. Tracy* (1995) 73 OhioSt.3d 119, 123 [1995 Ohio 130, 652 N.E.2d 693, 697] (*SFA Folio Collections*) and *Bloomingdale's v. Dept. of Revenue* (Pa.Cmmw.Ct. 1989) 567 A.2d 773, 778 [130 Pa.Commw. 190] (*Bloomingdale's*), which held that a department store's acceptance of returns from an affiliated out-of-state mail-order business was insufficient to create a substantial nexus between the mail-order company and the state. But in *SFA Folio Collections*, the mail-order house did not formulate or initiate the return policy. Rather, the returns were accepted according to the department store's own policy for its own benefit and for the convenience of its customers. (*SFA Folio Collections, supra*, 652 N.E.2d at pp. 696–697.) And in *Bloomingdale's* the acceptance of two returns from mail-order customers was considered an aberration from the normal practice. (*Bloomingdale's, supra*, 567 A.2d at p. 778.)

Online also contends that the Board must present evidence that quantifies the activities actually undertaken by Borders on behalf of Online establishing that those activities had more than a de minimis effect on Online's sales. While it is true that substantial nexus will be measured by the "extent and nature of the contacts between the state and the foreign corporation" (*Illinois Commercial Men's Assn. v. State Bd. of Equalization* (1983) 34 Cal.3d 839, 844 [196 Cal.Rptr. 198, 671 P.2d 349]), Online has cited no case, and we have found none, that requires this to be quantified in the first instance by the taxing agency. Indeed, the authorities are virtually unanimous that one who claims an exemption from taxation has the burden of proving it. " 'The retailer has the burden of proving facts establishing his right to exemption.' The rule is a reasonable one since the taxpayer is in the best position to create and maintain records of his transactions and to destroy or conceal such records. [Citation.]" (*Pope v. State Bd. of Equalization* (1988) 202 Cal.App.3d 73, 84 [248 Cal.Rptr. 246]; see also *City of Los Angeles v. Moore Business Forms, Inc.* (1966) 247 Cal.App.2d 353, 361–362 [55 Cal.Rptr. 820]; *Sunshine Art Studios of California, Inc. v. State Bd. of Equalization* (1974) 39 Cal.App.3d 223, 230–231 [114 Cal.Rptr. 24].) Here, Borders did not keep records of the returns from Online customers, and presumably, also did not record each instance in which an employee referred a customer to Online, nor keep track of how many receipts were imprinted with "Visit us online at www.Borders.com." Accordingly, we cannot see how such evidence would even be assembled. We do agree that evidence of de minimis local activities or proof that the local activities do not generate any significant proportion of local sales would create an issue of fact that would have to be resolved at trial. No such evidence was introduced by Online, other than a declaration by Borders's former tax manager that Borders "expected" only a small amount of returns.

Our holding is not affected by the fact Online's return policy was not posted on its Web site during the entire disputed period. The trial court held that its finding Online had a substantial nexus with California was not affected by evidence that the company's return policy was not in effect during the entire disputed period.[11] Quoting *Scripto, supra,* 362 U.S. at page 211, the trial court's order stated, "[e]vidence that an out-of-state retailer's physical presence in the taxing state was not continuous throughout the entire tax period in controversy is 'without constitutional significance.' " The trial court also cited *Scholastic, supra,* 207 Cal.App.3d at pages 738–740. The trial court's reliance on these cases was somewhat misplaced.

---

[11] The trial court's statement that the policy was not "in effect" during the entire disputed period appears to be erroneous. (See fn. 12, *post.*) It is clear, however, that the policy was *posted on Online's Web site* for 10 months of the disputed 18-month period.

In *Scripto*, the Supreme Court upheld the imposition of Florida's use tax on a Georgia company that used jobbers in Florida to sell its goods. (*Scripto, supra*, 362 U.S. at pp. 207, 211–212.) The court concluded that although the jobbers were not regular employees of the taxpayer and did not work full time for the company, "such a fine distinction is without constitutional significance." (*Id.* at p. 211.) This conclusion was based on the fact that the 10 jobbers working in Florida provided "continuous local solicitation" in the state and secured a "substantial flow of goods" into the state. (*Ibid.*) The fact the jobbers worked for several principals did not change the fact they provided the taxpayer with its sales in the state. (*Id.* at pp. 211–212.) Similarly, in *Scholastic*, the court held that the fact teachers did not work exclusively for the appellant book company did not affect whether they provided a substantial nexus with California, because the company depended on them for all its revenues in California. (*Scholastic, supra*, 207 Cal.App.3d at pp. 739–740.) In both *Scripto* and *Scholastic*, the courts looked at the extent of the actions of the taxpayers' agents and did not consider the issue presented here—whether a lack of temporal continuity in advertising of a policy designed to induce sales affected the constitutional analysis.

We conclude that the fact Online's return policy was posted for less than 11 months during the 18-month disputed period does not alter the constitutional analysis. As Online itself notes, the question for purposes of the commerce clause is the "nature and extent" of the activities in the taxing state. Here, Borders stood ready to accept returns and issue refunds for all Online merchandise purchased in California, whether or not this policy was actually posted on Online's Web site.[12] All the while, Borders and Online were involved in cross-promotional activities, promoting the Borders "brand." Were we to accept Online's argument that a substantial nexus did not exist during the entire time period, the company would be free to simply promote the policy through its in-state agent and reap the benefits of that policy while avoiding the state's use tax by promoting—and then simply removing—the policy on its Web site.

In short, we conclude that the imposition of a use tax on Online during the entire disputed period does not violate the commerce clause of the United States Constitution.

---

[12] Attached to a declaration from Borders's former tax manager was the "general Borders refund policy in effect for 1998 and 1999" (the entire disputed period). That policy provided that Online merchandise could be returned to Borders for credit card credit or store credit, and further—as of September 30, 1999—expanded that policy to include refunds of shipping charges to Online customers who received damaged goods or the wrong item. Online insists that the effective time period of the return policy is an "issue[] of material fact in dispute" but does not explain why this is so in light of the cited evidence.

## III. DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal.

Reardon, Acting P. J., and Sepulveda, J., concurred.