Filed 5/7/13  Lopez v. Broukhim CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JESSICA LOPEZ, a Minor, etc., | B239728 |
| Plaintiff and Appellant, | (Los Angeles County |
| v. | Super. Ct. No. LC091675) |
| BIJAN BROUKHIM et al., | |
| Defendants and Respondents. | |

APPEAL from summary judgment of the Superior Court of Los Angeles County. James A. Kaddo, Judge.  Affirmed.

Nathaniel J. Friedman for Plaintiff and Appellant Jessica Lopez, a Minor, etc.

La Follette, Johnson, De Haas, Fesler & Ames, Don Fesler and David J. Ozeran for Defendants and Respondents Bijan Broukhim, M.D., and Bijan Broukhim, M.D., Inc. dba Golden Care Medical Group.

Schmid & Voiles, Denise H. Greer, Rodney G. Tomlinson, and Adam R. James for Defendant and Respondent George M. Delshad, M.D.

_____

This appeal arises from a minor's action for "wrongful life" based upon allegations of medical malpractice against multiple doctors and health care providers. The trial court granted motions for summary judgment in favor of two doctors in their individual capacities – Drs. George Delshad and Bijan Broukim – and also Dr. Broukim as a professional corporation doing business as Golden Care Medical Group. We affirm.

**FACTS**

*Medical Treatment*

Plaintiff and appellant Jessica Lopez was born in June 2003 with spina bifida, a congenital disorder resulting from an anomaly of the neural tube. Spina bifida is not caused by any medical treatment; it is a genetic condition. The only way to prevent a fetus with the anomaly from progressing to being born with spina bifida is to abort the fetus.

Golden Care Medical Group is located in Van Nuys. Jessica's mother, Reyna Rosas, received prenatal care at Golden Care Medical Group on a number of occasions during her pregnancy with Jessica.[1] A nurse practitioner saw Ms. Rosas four times between October 2002, and March 2003. A family practice physician, Dina Ross, M.D., saw Ms. Rosas once in November 2002 and once in December 2002.

---

[1] Undisputed evidence in the record shows that Golden Care Medical Group was a registered "doing business as" (dba) fictitious name of Alejandro Gonzales in 2002 and 2003, when Ms. Rosas received medical care at the group. A dba is not a recognized legal entity; it is a registered fictitious name. The purpose of the registered dba procedure is to allow the public to identify a business's owner. (See, e.g., *Ball v. Steadfast-BLK* (2011) 196 Cal.App.4th 694, 701.) Business & Professions Code section 2415 authorizes physicians who are licensed in California to practice medicine under a registered fictitious name. The business organization and history of the owners of the registered dba "Golden Care Medical Group" is discussed more extensively below as relevant to the issues argued by Jessica on appeal. The record shows that Alejandro Gonzalez is a doctor of osteopathic medicine (D.O.). Jessica named Dr. Gonzalez as a defendant in her current wrongful life action, but he is not involved in her current appeal.

In January 2003, when Ms. Rosas was an estimated 18 weeks gestation, she was referred for Alpha-Fetoprotein (AFP) testing. AFP testing is not specific for spina bifida, but a high level of AFP can be an indicator of spina bifida. The AFP test was negative.

Ms. Rosas received ultrasounds at Golden Care Medical Group on January 10, 2003, at approximately 18 weeks gestation, and on March 7, 2003, at approximately 26 weeks gestation. Dr. Maria Rodriguez[2] interpreted the January 2003 ultrasound. Her report stated: "No gross fetal abnormality observed." At her deposition taken in Jessica's current case, Dr. Rodriguez testified that the January 2003 ultrasound was a "level one" ultrasound, which means is used to determine gestational age. Leonard Feigenbaum, M.D., interpreted the March 2003 ultrasound. Dr. Feigenbaum's report did not note any gross fetal abnormality, and concluded Ms. Rosas had a "viable single intrauterine pregnancy of an approximate menstrual age of 26 weeks."

George Delshad, M.D. delivered Jessica. Dr. Delshad first saw Ms. Rosas at the Golden Care Medical Group on March 18, 2003, when Ms. Rosas was at approximately 28 weeks gestation. He saw Ms. Rosas at Golden Care Medical Group three more times in April and May 2003, before delivering Jessica on June 3, 2003. It is undisputed that Dr. Delshad had no physician-patient relationship with Ms. Rosas prior to March 18, 2003. He never met Ms. Rosas prior to that date, and had no involvement with her medical care and treatment prior to that date.

When Dr. Delshad first saw Ms. Rosas on March 18, 2003, he reviewed her chart at Golden Care Medical Group, including the January 10, 2003 and March 7, 2003 ultrasound reports. He did not review the recorded ultrasound images themselves, but relied on the reports by the radiologists as described above.

### Golden Care Medical Group

As noted, Ms. Rosas received prenatal care in 2002 and 2003 at the Van Nuys clinic she knew as Golden Care Medical Group. During that time, Alejandro Gonzalez, D.O. registered the Van Nuys clinic under the dba name of Golden Care Medical Group.

---

[2] Dr. Rodriguez is a named defendant, but not a party to Jessica's current appeal.

3

On January 14, 2008, approximately four and one-half years after Jessica was born, and almost three years before she filed her wrongful life action, Dr. Gonzalez and Bijan Broukhim, M.D., Inc. (hereafter Dr. Broukhim Inc.) executed a "Letter of Understanding" (LOU) for the purchase of "'Golden Care Medical Group.'" Bijan Broukhim executed the LOU, acting for Dr. Broukhim, Inc. It is undisputed that Broukhim is an M.D., licensed to practice medicine in California.

Paragraph 4 of the LOU provided that Dr. Broukhim, Inc. would purchase from Dr. Gonzalez "all tangible and intangible assets related to the Van Nuys Clinic . . . ," and described those assets to include patient lists and files, goodwill, and identified medical and office equipment on site. The LOU referred to Dr. Gonzalez as the "Seller" and Dr. Broukhim, Inc. as the "Buyer." The LOU stated a sale price totaling $200,000, payable according to a schedule of payments to be completed over a four-month period.

Paragraph 6 of the LOU reads: "Buyer shall not assume or become responsible for any of Seller's duties, obligations or liabilities not expressly assumed by Buyer pursuant to this Agreement, including without limitation any liabilities (i) associated with the Van Nuys Clinic Assets arising prior to the Closing Date and (ii) associated with any assets of Seller other than [the] Van Nuys Clinic Assets." Further, Paragraph 9 of the LOU set forth terms governing Dr. Gonzalez's "indemnification" of Dr. Broukhim for any and all claims and damages "relating to the Van Nuys Clinic" on or before the closing date of the sale/purchase. Paragraph 9 includes this closing sentence: "It is the intention of Buyer and Seller that Buyer shall take possession of the Van Nuys Clinic free and clear of any and all liabilities, debts, accounts payable, and obligations other than those expressly assumed by the terms of this Agreement."[3] Paragraph 2 of the Letter set the closing date for the sale and purchase for January 18, 2008.

---

[3]  At his deposition in Jessica's current case, Dr. Gonzalez testified that it was his understanding that pursuant to the agreement, Dr. Broukhim Inc. would not be responsible for any patient care at the clinic before the date the agreement was signed.

Jessica's legal arguments in the trial court and on appeal are predicated on the position that the history leading up to the agreement between Dr. Gonzalez and Dr. Broukhim, Inc. for the Van Nuys clinic known as Golden Care Medical Group is relevant. Accordingly, we set forth those facts, as follows.

Gold Medical Group, Inc. was incorporated in 1997, and owned three medical clinics, one of which was the clinic in Van Nuys where Ms. Rosas went for treatment during her pregnancy with Jessica. Gold Medical Group, Inc. registered a dba for the Van Nuys clinic, namely, Golden Care Medical Group. In or about 1999, Dr. Gonzalez purchased Gold Medical Group, Inc. from Amos Woodard, M.D.[4]

Pursuant to an agreement finalized in February 2007, Dr. Gonzalez sold Gold Medical Group, Inc. to Jason Boutros, M.D. However, Dr. Gonzalez kept the Van Nuys clinic then operating under the dba Golden Care Medical Group. To that end, the assets of the Van Nuys clinic, i.e., the dba Golden Care Medical Group, were specifically carved out of the agreement for the sale of Gold Medical Group, Inc., and Dr. Gonzalez retained them. A document entitled "Minutes of Organizational Meeting of Directors of Gold Medical Group, Inc.," dated February 28, 2007, states that Golden Care Medical Group in Van Nuys was excluded from the sale of Gold Medical Group, Inc. to Dr. Boutros. In May 2007, the Articles of Incorporation of Gold Medical Group, Inc. were amended to reflect Dr. Boutros's takeover of the corporation. It did not include ownership of the Van Nuys clinic, i.e., the dba Golden Care Medical Group.

Ultimately, on January 14, 2008, Dr. Gonzalez and Dr. Broukhim, Inc., acting by Dr. Broukhim, signed the LOU regarding the purchase of Golden Care Medical Group. On January 16, 2008, Dr. Broukhim, Inc. filed a dba fictitious business name statement for Golden Care Medical Group. On January 18, 2008, Dr. Gonzalez sent a letter to all of the employees at the Van Nuys clinic, reading as follows: "Golden Care Medical Group has been purchased by Dr. Bijan Broukhim, M.D., Inc. Therefore with the effective day of purchase you will no more be employed by Gold Medical Group, Inc./dba Golden

---

[4]      Woodard is not a party to Jessica's wrongful life action or her current appeal.

Care Medical Group." Dr. Gonzalez also released the lease between Gold Medical Group, Inc. and Sam & Sam, Inc. for the space occupied by Golden Care Medical Group.

In summary, Dr. Gonzalez owned Gold Medical Group, Inc. dba Golden Care Medical Group during 2002 and 2003, at the time of the medical malpractice alleged by Jessica. He sold Gold Medical Group, Inc. to Dr. Boutros in February 2007, but retained for himself the assets of the Van Nuys clinic dba Golden Care Medical Group. Dr. Gonzalez then sold the assets of the clinic dba Golden Care Medical Group to Dr. Broukhim, Inc. in January 2008.

### *The Litigation*

In November 2010, Ms. Rosas filed a complaint for damages on behalf of Jessica. She alleged a cause of action for professional negligence and related claims. Jessica's action named the following defendants: "Golden Care Medical Group" and "Golden Care Medical Clinic" ("exact business forms unknown"), Dr. Gonzalez, Dr. Rodriguez, Dr. Delshad, Dr. Broukhim, and Dr. Broukhim, Inc. dba Golden Care Medical Group. As relevant to her current appeal, Jessica's action alleges that the defendants were negligent in providing medical care in that they failed to diagnose spina bifida in utero. Absent the negligence, Jessica argues, she "would not have been born" because her mother, Ms. Rosas, would have terminated the pregnancy. Jessica alleges she has incurred medical expenses to treat her condition, and will incur ongoing medical expenses in the future.

In July 2011, Dr. Delshad, Dr. Broukhim, and Dr. Broukhim, Inc. dba Golden Care Medical Group filed a joint motion for summary judgment. The trial court ordered supplemental briefs and evidentiary submissions concerning the business history and organization of Golden Care Medical Group. After oral argument, the court entered a summary judgment in favor of Dr. Broukhim, individually, and Dr. Broukhim, Inc. dba Golden Care Medical Group; and a second summary judgment in favor of Dr. Delshad.

Jessica filed a timely notice of appeal.

6

# DISCUSSION

Jessica contends the trial court erred by granting the joint motion for summary judgment. We disagree.

## I. Standard of Review

Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment meets this burden by presenting evidence demonstrating that one or more elements of the cause of action cannot be established or that there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 853-854 (*Aguilar*).) Once the defendant makes this showing, the burden shifts to the plaintiff to show the existence of a triable issue of material fact as to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar, supra*, 25 Cal.4th at p. 850.)

To determine whether the parties have met their respective burdens, the appellant court considers "'all of the evidence set forth in the [supporting and opposition] papers, except that to which objections have been made and sustained by the court, and all [uncontradicted] inferences reasonably deducible from the evidence.'" (*Artiglio v. Corning Inc*. (1998) 18 Cal.4th 604, 612.) A plaintiff opposing summary judgment cannot rely upon the mere allegations or denials of its pleadings, but "shall set forth the specific facts" based on admissible evidence showing a triable issue exists. (Code Civ. Proc., § 437c, subd. (p)(2); *Borders Online v. State Bd. of Equalization* (2005) 129 Cal.App.4th 1179, 1188.) When a moving party makes the required prima facie showing, an opposing party's failure to comply with this requirement may, in the court's discretion, constitute a sufficient ground for granting the motion. (See *Buehler v. Alpha Beta Co*. (1990) 224 Cal.App.3d 729, 734-735; *Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co*. (2009) 170 Cal.App.4th 554, 568.)

However, the court may not grant the motion unless it first determines that the moving party has met its initial burden of proof. (See *Thatcher v. Lucky Stores, Inc.* (2000) 79 Cal.App.4th 1081, 1086 ["[U]nless the moving party has met its initial burden of proof, the court does not have discretion under subdivision (b) of section 437c to grant summary judgment based on the opposing party's failure to file a proper separate statement."]; *Kulesa v. Castleberry* (1996) 47 Cal.App.4th 103, 106 [trial court must consider all of the papers submitted before exercising its discretion to grant a summary judgment based on the failure to file an adequate separate statement]; *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 746.) When the facts are undisputed, the court may grant summary judgment on issues that otherwise could have been submitted to the jury because "[a]n issue of fact becomes one of law and loses its 'triable' character if the undisputed facts leave no room for a reasonable difference of opinion." (*Ostayan v. Serrano Reconveyance Co.* (2000) 77 Cal.App.4th 1411, 1418.) Thus, the defendant is entitled to summary judgment if the record establishes as a matter of law that none of plaintiffs' asserted causes of action can be maintained. (*Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 270.)

An appellate court independently reviews an order granting summary judgment. (*Aguilar, supra,* 25 Cal.4th at p. 860.) We determine whether the court's ruling was correct, not its reasons or rationale. (*Salazar v. Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1376.) "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925.) "'In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [his or] her evidentiary submission while strictly scrutinizing [defendant's] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor.' [Citations.]" (*United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1009; accord, *Aguilar, supra*, 25 Cal.4th at p. 843.)

## II.    The Summary Judgment Motion

Dr. Broukhim supported his motion by evidence showing that he never provided any medical care to Ms. Rosas.[5]  As to Dr. Broukhim, Inc. dba Golden Care Medical Group, the motion was based on evidence showing the corporation had only purchased the assets of the group in Van Nuys, and had not assumed any of the group's pre-sale liabilities.

Dr. Delshad submitted an expert's declaration showing that the treatment he rendered satisfied the standard of care.  Dr. Delshad's evidence showed it was appropriate for him to rely upon the radiologists' ultrasound reports when he began treating Ms. Rosas, neither of which noted any anomaly.  Also, because Ms. Rosas was not at high risk for having a baby with a neural tube defect, he did not need to offer further ultrasound or genetic testing services.  Finally, his expert opined the standard of care does not require a doctor to offer those further services beyond the gestational age of 24 weeks; Dr. Delshad first became involved in Ms. Rosa's care at 28 weeks of pregnancy.

Jessica opposed the motion for summary judgment by filing an evidentiary objection to the entirety of the expert's declaration in support of Dr. Delshad.  Relying on *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, Jessica argued the declaration was insufficient to support the motion or to shift the burden of proof.  Jessica also offered declarations from two different experts.  An expert radiologist opined that Dr. Rodriguez was negligent in interpreting and following up on Ms. Rosas's January 2003 ultrasound.

Specifically, Jessica submitted an expert opinion from Marshall Kadner, M.D. to show Dr. Delshad's medical treatment fell below the requisite standard of care. Dr. Kadner's declaration provided as follows:

> "The physician receiving [Dr. Rodriguez's January 2003 ultrasound]
> report, i.e., Dr. Delshad . . . or other health care provider involved, at the
> time, acted below the standard of care by failing to review and react, fully,

---

[5]    In her opposition to the motion for summary judgment as to Dr. Broukhim, Jessica admitted that he never personally rendered any medical care to her mother.

to the ultrasound report, which should have described a nervous system abnormality, i.e., enlarged brain ventricles, which often are associated with severe neurological anomalies, including spina bifida, which was in fact, present in this case. [¶] . . . Further studies would very probably have revealed the abnormality, which would have provided Ms. Rosas information and the time for deciding whether or not to continue [her] pregnancy. . . ."

In a motion for new trial, after the motion for summary judgment was granted, Jessica presented a second expert declaration which opined that Dr. Delshad was negligent in delivering her.

## III.    Jessica's Appeal as to Dr. Broukhim, Individually

In her opposition to the motion for summary judgment as it concerned Dr. Broukhim individually, Jessica admitted that he never personally rendered any medical care to her mother. Given the absence of any physician-patient relationship, Dr. Broukhim cannot be found liable for medical malpractice. (*Keene v. Wiggins* (1977) 69 Cal.App.3d 308, 312-316.) As a result, we find summary judgment in favor of Dr. Broukhim as an individual physician was properly granted.

## IV.    Jessica's Appeal as to Dr. Broukhim, Inc. dba Golden Care Medical Group

Jessica contends summary judgment in favor of Dr. Broukhim, Inc. dba Golden Care Medical Group must be reversed because there are disputed issues of fact as to liability arising from the corporation's ownership of the Van Nuys clinic dba Golden Care Medical Group. Jessica argues that by retaining the name of Golden Care Medical Group, Dr. Broukhim, Inc., received the benefit of portraying a continuity of ownership of an existing business. Jessica claims that, as a result, there are triable issues of fact concerning principles of ostensible agency as defined in Civil Code section 2317. We disagree.

Civil Code section 2317 reads: "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." In 2002 and 2003, when Ms. Rosas received medical treatment care at

10

Golden Care Medical Group, no person or entity affiliated with the clinic said or did anything that could have caused Ms. Rosas to believe that Dr. Broukhim, Inc., or Dr. Broukhim, individually, was an agent of the clinic. And, no person or entity affiliated with Dr. Broukhim, Inc., or Dr. Broukhim, individually, said or did anything that could have caused Ms. Rosas to believe that the clinic was an agent of the corporation or the doctor, individually. In 2002 and 2003, *there was no factual or legal relationship whatsoever* between Dr. Broukhim, Inc., or Dr. Broukhim, individually, and Golden Care Medical Group. Jessica's ostensible agency argument is a non sequitur.

Jessica's extensive discussions of cases such as *Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448, and *Stanhope v. L.A. Coll. of Chiropractic* (1942) 54 Cal.App.2d 141, as they involve ostensible agency in the context of hospitals are not helpful. We reiterate: as between Dr. Broukhim – whether in an individual status or in a corporate capacity – and the Van Nuys medical clinic, there was no relationship between 2002 and 2003. No person or entity in any role, in any place, did or said anything to anyone during that time period to create or sever any impression that there was any agency relationship between the two.

The true issue here is one of successor liability. Ordinarily, the doctrine of successor liability has been addressed in a context where two *corporations* have entered a sale and purchase transaction. As typically formulated, successor liability rules provide that a purchasing corporation does not assume the liabilities of a selling corporation "unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." (*Ray v. Alad Corp*. (1977) 19 Cal.3d 22, 28; and see, e.g., *Franklin v. USX Corp*. (2001) 87 Cal.App.4th 615, 621.) Although the doctrine of successor liability ordinarily applies in the context of two corporations, courts have applied the doctrine as an equitable measure where a corporation succeeds a partnership or an individual business operation.

11

(See generally, *Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1327-1334 [discussing the doctrine of successor liability].)

Here, the transaction between Dr. Gonzalez and Dr. Broukhim, Inc. defeats a finding that Dr. Broukhim, Inc. may be found to have successor liability for Dr. Gonzalez. Indeed, the LOU expressly provided that Dr. Broukhim, Inc. was purchasing the assets of the Van Nuys medical clinic *and was not* assuming any of the liabilities related to the clinic prior to the date of the transaction. There was no consolidation or merger. Dr. Gonzalez sold out; Dr. Broukhim, Inc. came in. Further, we see no evidence tending to show a fraudulent transaction to escape a liability — Jessica had yet not filed her suit when Dr. Gonzalez sold, and Dr. Broukhim, Inc. purchased the assets of the Van Nuys clinic.

## V.     Jessica's Appeal as to Dr. Delshad, Individually

Jessica argues the trial court erred in granting summary judgment in favor of Dr. Delshad because there are triable issues of fact concerning his liability for medical malpractice. Essentially, Jessica argues that because she presented an expert declaration in opposition to the one presented by Dr. Delshad, summary judgment should not have been granted. Not so.

Dr. Delshad moved for summary judgment as to the medical malpractice claim relying upon a declaration from Dr. C. Paul Sinkhorn, a board certified doctor in obstetrics and gynecology since 1987. Dr. Sinkhorn opined Dr. Delshad did not breach the standard of care in treating Ms. Rosas. Specifically, Dr. Sinkhorn indicated that the standard of care allowed Dr. Delshad to rely upon the radiologists' January and March 2003 ultrasound reports, which did not show any anomaly indicative of spina bifida. Further, Ms. Rosas was not at high risk for having a baby with a neural tube defect, so the standard of care did not require Dr. Delshad to offer more testing to check for its presence. Finally, because Ms. Rosas was 28 weeks pregnant when Dr. Delshad first saw her, the fetus was viable. The standard of care did not require more ultrasound or genetic testing or abortion counseling past the gestational age of 24 weeks.

12

***Opposition by the Declaration of Dr. Kadner***

In opposition, Jessica offered Dr. Kadner's declaration. Dr. Kadner offered an opinion that Dr. Delshad "acted below the standard or care by failing to review and react, fully, to the [January 2003] ultrasound report, *which should have* described a nervous system abnormality . . . ."

Dr. Kadner did not address or offer an opinion on whether the standard of care required Dr. Delshad to do more than review the ultrasound reports; to order further ultrasound or genetic testing given Ms. Rosas's lack of risk for having a baby with a neural tube defect; or whether the Dr. Delshad was required to offer such further services to a patient, Ms. Rosas, who was at 28 weeks of pregnancy. Further, given that the January 2003 ultrasound report did not describe a nervous system abnormality, Dr. Kadner's declaration does not apply to the facts of Jessica's case. As a result, we see no triable issue of fact left for a jury to resolve.

Jessica's argument that the trial court incorrectly relied on *Kelley v. Trunk* (1998) 66 Cal.App.4th 519 (*Kelley*), in granting the motion as to Dr. Delshad does not persuade us to reverse. In *Kelley*, the issue was whether a party moving for summary judgment had presented sufficient evidence to meet his burden of showing a defense to the action. The Court of Appeal reversed the trial court's grant of summary judgment, finding the moving party's evidence consisted of nothing more than an expert's conclusory declaration. Assuming, as Jessica argues, that *Kelley* is inapposite because the issue is the sufficiency of her evidence opposing a motion for summary judgment, we are not persuaded to reverse. The task of a reviewing court is to review the lower court's ruling, not its reasoning. (See, e.g., *Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336.) As explained above, we find the trial court correctly ruled that Jessica failed to present evidence showing a triable issue of fact existed as to the standard of care. Accordingly, we will not reverse the trial court's decision based on Jessica's argument under *Kelley, supra*.

13

We also disagree with Jessica that the trial court erred in characterizing Dr. Kadner's averments as "unsupported conclusions." As we observed, Dr. Kadner did not respond to the standard of care evidence presented by Dr. Sinkhorn. Instead, Dr. Kadner offered an opinion that Dr. Delshad should have responded to a problem with the January 2003 ultrasound. However, the assertion of perceived negligence simply did not exist in this case; there was no anomaly in the January 2003 ultrasound.

Jessica's reliance on *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108 (*Guthrey*), for a different result is also not persuasive. The appeal in *Guthrey* arose from an employment discrimination and harassment action. The state employer and related defendants filed a motion for summary judgment and the plaintiff opposed it with a declaration that he had been "'given a Letter of Reprimand, harassed, and subjected to a hostile work environment.'" (*Id*. at p. 1121, italics omitted.) The trial court granted the motion and entered summary judgment in favor of the moving parties. The Court of Appeal affirmed, rejecting the plaintiff's argument that his averments of "harassment" were sufficient to create a triable issue of fact. The Court of Appeal ruled that the plaintiff's declaration was not sufficient to defeat the motion because the averments of "harassment" were not supported by facts to support them. (*Id*. at pp. 1119-1120.)

In Jessica's current case, she argues that Dr. Kadner's declaration in opposition to Dr. Delshad's motion for summary judgment is sufficiently more detailed than the declaration which was at issue in *Guthrey*. Jessica argues that Dr. Kadner's declaration included sufficient supporting facts to overcome Dr. Delshad's motion. On the contrary, Dr. Kadner's declaration suffered from the same lack of supporting facts as did the declaration in *Guthrey*. Dr. Kadner offered no more than a generalized statement that Dr. Delshad violated the standard by not doing more. However, he does not say what more Dr. Delshad should have done after properly reviewing the January 2003 ultrasound report which noted no abnormalities. He instead states the ultrasound "should have described" a neural tube defect.

14

We agree with Jessica that the opposing party's burden is one of production of evidence rather than persuasion. We add that, in ruling on such a motion, a court may not weigh the evidence in the manner of a factfinder, and that a court must liberally construe opposition papers. The problem with application of these rules here is that they do not defeat the trial court's decision to grant the motion as to Dr. Delshad because Jessica's evidence submitted in opposition to the motion did not show the existence of disputed fact concerning the standard of care.

### *Opposition by the Declaration of Dr. Robertson in the Motion for New Trial*

Jessica's final argument is that the expert declaration she submitted from Patricia Robertson, M.D., raised triable issues of fact as to Dr. Delshad's negligence which requires reversal of the grant of the motion as to Dr. Delshad. We disagree.

In support of a motion for new trial, Jessica submitted the declaration from Dr. Robertson. Dr. Robertson's declaration faults Dr. Delshad's treatment on June 2 and 3, 2003, when Ms. Rosas delivered Jessica. Dr. Robertson's declaration concludes: "The aforesaid negligent conduct on the part of Dr. Delshad was a substantial factor in the outcome because, if [Jessica] had been transferred to a higher level care facility for delivery and care, for example, UCLA, it is more likely that [*sic*] not that her level of functioning would be better than it is today." Dr. Roberston did not state her opinion to a reasonable degree of medical certainty. The trial court denied Jessica's motion for new trial.

A trial court has broad discretion in ruling on a new trial motion, and the court's ruling will not be disturbed on appeal absent a showing of abuse of discretion. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870-872.) Jessica's argument does not persuade us to reverse the judgment because she has not shown that the trial court abused its discretion in denying her new trial motion. Procedurally, Jessica did not file her supporting papers for her new trial motion within the prescribed time. Under Code of Civil Procedure section 659a and California Rules of Court, rule 3.1600(a), she had 10 days after the filing of her notice of intention to move for new trial in which to file her papers in support of her motion. Jessica missed the deadline for filing her supporting

15

papers by seven days. Further, Jessica made no showing that Dr. Robertson's evidence was "newly discovered," and could not have been reasonably discovered earlier. (Code Civ. Proc., § 657, subd. 4.) The failure to adhere to these guidelines for a new trial shows the trial court's decision to deny Jessica's motion for new trial was within the bounds of its discretion. (*In re Marriage of Steiner & Hosseini* (2004) 117 Cal.App.4th 519, 529.)

Neither was Jessica's motion for new trial well-taken on the merits. Dr. Robertson's declaration concerned a perceived substandard physician performance during the delivery of Jessica, which was not alleged in Jessica's complaint. To show the existence of a triable issue of fact, evidence in opposition to a motion must address the issues framed by the pleadings. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258, fn. 7.) To allow Jessica to do what she tried to do here would have unfairly put Dr. Delshad to the burden of defending against a moving target. (*Ibid.*) We also note that Dr. Robertson's declaration as to causation between any perceived negligence and Jessica's diminished well-being was insufficient because Dr. Robertson did not state to a reasonable degree of medical certainty that Jessica would function better today but for the deficient physician performance assigned to Dr. Delshad.

For all of the reasons discussed, the trial court did not rule arbitrarily or irrationally in denying Jessica's new trial motion. (*Blackman v. Burrows* (1987) 193 Cal.App.3d 889, 893 [a court abuses judicial discretion when its ruling is arbitrary, capricious or without basis in reason].)[6]

---

[6]   Jessica's opening brief on appeal has significant discussions about the liability of "Golden Care Medical Group" for the negligence of its "employees" and or "agents." For example, Jessica argues "Golden Care Medical Group" may be held liable for Dr. Rodriguez's deficient performance in interpreting Ms. Rosas's ultrasound in January 2003, and that "Golden Care Medical Group" may be held liable for Dr. Delshad's deficient performance in 2003 in not diagnosing Jessica's neural anomaly in utero. We express no view on the possible liability of any person or entity that may have done business as Golden Care Medical Group in 2002 and 2003. Only three judgments are at issue on Jessica's appeal: the judgment in favor of Dr. Delshad, individually, the judgment in favor Dr. Broukhim, individually, and Dr. Broukhim, Inc, dba Golden Care Medical Group. We affirm those three judgments for the reasons discussed above.

## DISPOSITION

The summary judgment entered on February 6, 2012, in favor of Bijan Broukhim, M.D., individually; Bijan Broukhim, M.D. Inc. dba Golden Care Medical Group and George Delshad, M.D. is affirmed.



BIGELOW, P. J.

We concur:


RUBIN, J.


GRIMES, J.

17